HULETT HARPER STEWART LLP
KIRK B. HULETT, SBN: 110726
SARAH PICKERAL WEBER, SBN: 239979
550 West C Street, Suite 1600
San Diego, CA  92101
Telephone:      (619) 338-1133
Facsimile:      (619) 338-1139

NICHOLAS & BUTLER, LLP
CRAIG M. NICHOLAS, SBN: 178444
MATTHEW B. BUTLER, SBN: 201781
225 Broadway, 19th Floor
San Diego, CA  92101
Telephone:      (619) 325-0492
Facsimile:      (619) 325-0496

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER L. LASTER, et al.<br><br>Plaintiffs,<br><br>v.<br><br>T-MOBILE USA, INC., et al.,<br><br>Defendants. | CASE NO. 05CV1167DMS (AJB)<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO COMPEL INDIVIDUAL ARBITRATION BY DEFENDANT AT&T MOBILITY LLC**<br><br>DATE:       May 30, 2008<br>TIME:        1:30 p.m.<br>JUDGE:     Hon. Dana M. Sabraw<br>CTRM:       10 |
| VINCENT CONCEPCION and LIZA CONCEPCION, on Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>CINGULAR WIRELESS LLC,<br><br>Defendant. | CASE NO. 06CV0675 DMS (NLS) |

1

**TABLE OF CONTENTS**

2   I.      INTRODUCTION ..................................................................................................1

3   II.     FACTUAL BACKGROUND ................................................................................2

4   III.    PROCEDURAL HISTORY...................................................................................5

5   IV.     ARGUMENT .........................................................................................................6

6           A.     The New Arbitration Provision Cannot Govern the Present Claims .....................6

7           B.     AT&T's New Provisions Regarding Damage and Attorneys' Fees
                   Premiums Are Not Dispositive and Fail to Provide the Necessary Relief
8                  that Aggregation Procedures Can Provide .............................................................7

9           C.     AT&T's Arbitration Clause Is Unconscionable Under California Law ...............10

10                 1.      AT&T Provision Is Procedurally Unconscionable ...................................11

11                 2.      AT&T's Arbitration Provision Is Substantively Unconscionable ............15

12          D.     Enforcement of Class Action Waivers Would Undermine the Importance of
                   Class Actions........................................................................................................19
13
            E.     The FAA Does Not Preempt California Law Regarding Unconscionable
14                 Contracts .............................................................................................................21

15          F.     Plaintiffs' Claims for Injunctive Relief Under the UCL Are Not Arbitrable ........24

16  V.      CONCLUSION....................................................................................................25

17

18

19

20

21

22

23

24

25

26

27

28

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*A&M Produce Co. v. FMC Corp.*,
    135 Cal. App. 3d 473 (1982).................................................................................... 11

*Abels v. JBC Legal Group, P.C.*,
    227 F.R.D. 541 (N.D. Cal. 2005) ............................................................................. 21

*Allied-Bruce Terminix Cos. v. Dobson*,
    513 U.S. 265 (1995).................................................................................................. 22

*Amchem Prods. v. Windsor*,
    521 U.S. 591 (1997).................................................................................................. 20

*Aral v. EarthLink, Inc.*,
    134 Cal. App. 4th 544 (2005) ............................................................................. 17, 24

*Armendariz v. Foundation Health Psychcare Servs.*,
    24 Cal. 4th 83 (2000) ................................................................................... 11, 15, 22

*Aronson v. Quick Point Pencil Co.*,
    440 U.S. 257 (1979).................................................................................................. 23

*Bates v. Dow Agrosciences L.L.C.*,
    544 U.S. 431 (2005).................................................................................................. 23

*Broughton v. Cigna Healthplans*,
    21 Cal. 4th 1066 (1999) ........................................................................................... 24

*Carnegie v. Household Int'l, Inc.*,
    376 F.3d 656 (7th Cir. 2004)..................................................................................... 20

*Circuit City Stores, Inc. v. Gentry*,
    No. 07-998, 2008 U.S. LEXIS 3000 (Mar. 31, 2008)............................................... 22

*Cohen v. DIRECTV, Inc.*,
    142 Cal. App. 4th 1442 (2006) ....................................................................... 15, 17, 18

*Crippen v. Central Valley RV Outlet, Inc.*,
    124 Cal. App. 4th 1159 (2004) ................................................................................. 11

*Cruz v. PacifiCare Health Systems, Inc.*,
    30 Cal. 4th 303 (2003) ............................................................................................. 24

*Deposit Guar. Nat'l Bank v. Roper*,
    445 U.S. 326 (1980).................................................................................................. 19

ii

*Discover Bank v. Superior Court*,
    36 Cal. 4th 148 (2005) ................................................................ *passim*

*Doctor's Assocs., Inc. v. Casarotto*,
    517 U.S. 681 (1996) ..................................................................... 22

*Flores v. Transamerica HomeFirst, Inc.*,
    93 Cal. App. 4th 846 (2001) .................................................... 12, 13

*Gatton v. T-Mobile USA, Inc.*,
    152 Cal. App. 4th 571 (2007) .................................................. 12, 13

*Gutierrez v. Autowest, Inc.*,
    114 Cal. App. 4th 77 (2003) ....................................................... 12

*Harper v. Ultimo*,
    113 Cal. App. 4th 1402 (2003) ................................................... 12

*In re Currency Conversion Fee Antitrust Litig.*,
    224 F.R.D. 555 (S.D.N.Y 2004) ................................................. 1, 6

*Indep. Ass'n of Mailbox Ctr. Owners v. Superior Court*,
    133 Cal. App. 4th 396 (2005) ..................................................... 17

*Ingle v. Circuit City Stores, Inc.*,
    328 F.3d 1165 (9th Cir. 2003) ............................................ 11, 16, 22

*Keating v. Superior Court*,
    31 Cal. 3d 584 (1982), *reversed on other grounds sub. nom. Southland Corp. v.*
    *Keating*, 465 U.S. 1 (1984) ................................................... 19, 20

*Kinney v. United HealthCare Servs., Inc.*,
    70 Cal. App. 4th 1322 (1999) ..................................................... 11

*Klussman v. Cross Country Bank*,
    134 Cal. App. 4th 1283 (2005) ................................................... 17

*Laster v. T-Mobile USA, Inc.*,
    407 F. Supp. 2d 1181 (S.D. Cal. 2005), *aff'd*,
    No. 06-55010, 2007 U.S. App. LEXIS 25265 (9th Cir. Oct. 16, 2007) ..... 12, 14, 22

*Long v. Fidelity Water Sys.*,
    No. C-97-20118, 2000 U.S. Dist. LEXIS 7827 (N.D. Cal. May 26, 2000) ......... 6, 7

*N. Pipeline Constr. Co. v. Marathon Pipeline Co.*,
    458 U.S. 50 (1982) ....................................................................... 23

*Shroyer v. New Cingular Wireless Servs., Inc.*
    498 F.3d 976 (9th Cir. 2007) .................................................... *passim*

iii

*State of California v. Levi Strauss & Co.*,
   41 Cal. 3d 460 (1986) ........................................................................................ 19

*Steiner v. Apple Computer, Inc.*,
   No. C 07-04486, 2008 WL 691720 (N.D. Cal. Mar. 12, 2008) ........................... 10

*Stewart Org., Inc. v. Ricoh Corp.*,
   487 U.S. 22 (1988) ............................................................................................ 23

*Stirlen v. Supercuts, Inc.*,
   51 Cal. App. 4th 1519 (1997) ........................................................................... 12

*Szetela v. Discover Bank*,
   97 Cal. App. 4th 1094 (2002) ........................................................................... 15

*Ting v. AT&T*,
   319 F.3d 1126 (9th Cir. 2003)............................................................. 8, 10, 15, 22

*United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*,
   363 U.S. 574 (1960) ............................................................................................ 7

## STATUTES, RULES AND REGULATIONS

9 U.S.C.
   § 2.................................................................................................................... 22

28 U.S.C.
   § 1711 note....................................................................................................... 23

Business and Professions Code
   § 17200............................................................................................................... 5
   § 17500............................................................................................................... 5

California Civil Code
   § 1670.5............................................................................................................ 11
   § 1668............................................................................................................... 17
   § 1750................................................................................................................. 5

## SECONDARY AUTHORITIES

David S. Schwartz, *State Judges as Guardians of Federalism: Resisting the Federal
   Arbitration Act's Encroachment on State Law*, 16 Wash. U. J.L. & Pol'y 129, 151
   (2004) ............................................................................................................... 20

Jean B. Sternlight & Elizabeth J. Jensen, *Using Arbitration to Eliminate Consumer Class
   Actions: Efficient Business Practice or Unconscionable Abuse*?, 67 Law & Contemp.
   Probs. 75 (2004) .............................................................................................. 20

iv

1
2

Jean R. Sternlight & Elizabeth J. Jensen, *As Mandatory Binding Arbitration Meets the Class Action, Will the Class Action Survive?*, 42 Wm. & Mary L. Rev. 1 (2000) ................ 21

3
4

Myriam Gilles, *Opting Out of Liability: The Forthcoming, Near-Total Demise of the Modern Class Action*, 104 Mich. L. Rev. 373, 407 (2005)..................................................... 21

5
6

*Restatement (Second) of Contracts* § 208 (1981) ....................................................... 11

S. Rep. 109-14, *reprinted at* 2005 U.S. Cong. Code and Admin. News 3, 5 (Feb. 28, 2005)........................................................................... 24

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

v

1

## I.    **INTRODUCTION**

By its motion, AT&T Mobility LLC ("AT&T")[1] seeks to immunize itself from class action liability by stripping Plaintiffs Vincent and Liza Concepcion of their rights to pursue a class action and forcing Plaintiffs to arbitrate on an individual basis.  Although this Court, the California Supreme Court and the Ninth Circuit have each already rejected similar efforts, AT&T seeks to end-run the California Supreme Court's decision in *Discover Bank v. Superior Court*, 36 Cal. 4th 148 (2005), and the Ninth Circuit's decision in *Shroyer v. New Cingular Wireless Servs.*, *Inc*. 498 F.3d 976 (9th Cir. 2007).  In doing so, AT&T boldly touts its class-action waiver provision, which was sent to Plaintiffs in an innocuous monthly statement bill-stuffer, as "the most pro-consumer arbitration provision in the country."  Def. Mem. at 4, 11, 2-3.  In so arguing, it is only damning itself with faint praise.[2]

First, the arbitration provision that AT&T claims governs here was not sent to consumers until December 2006, twenty-two months after they bought the "Free Phone" and nine months after this litigation began.  These facts alone defeat Defendant's arguments because, as a matter of law, an arbitration clause inserted into an agreement after the commencement of litigation cannot apply to existing claims.  *See*, *e.g.*, *In re Currency Conversion Fee Antitrust Litig.*, 224 F.R.D. 555, 569 (S.D.N.Y 2004).  As such, any ruling by the Court regarding the validity of the present provision would be merely advisory.

Should the Court elect to look at the unconscionability issue, the current provision does no more to help consumers than the similarly offending prior provisions, and, in fact, more offending of Plaintiffs' rights given the purported newly agreed to breadth of the claims allegedly covered by the bill-stuffer agreement.  AT&T's self-labeled consumer friendly adhesion contract now offers a

---

[1]  AT&T was formerly known as Cingular Wireless but will be referenced throughout as "AT&T" for clarity.

[2]  In an effort to bolster its facetious self-label, it offers the declaration of Richard A. Nagareda. Professor Nagareda's opinion, however, is far from objective, as he was paid by AT&T to assist in creating the clause.  *See* Berinhout Decl., ¶ 8.  Thus, his opinion is no less biased than if it were offered by AT&T's own CEO.  For this and other reasons, Plaintiffs have moved to strike the Nagareda Declaration.  *See* Objection to and Motion to Strike the Declaration of Richard A. Nagareda, filed concurrently herewith.

1

maximum of $7500 per customer and twice the "reasonable" attorneys' fees to pursue a claim if but *only* if the consumer rejects the "last settlement offer" and thereafter prevails by judgment in an amount which exceeds the last settlement offer.  For AT&T, this represents a remarkable bargain: AT&T grants itself free-reign to misrepresent the terms of sale and reap a huge financial wind-fall, while precluding the class-wide relief essential for rectifying the harm caused.  AT&T knows neither customers nor attorneys' advocating on their behalf would have any real incentive to pursue individual $100 or less claims, especially knowing the $7500 prize is available *only* if a judgment exceeds a settlement offer.  Predictably, a settlement offer of $100 would be made and thus no attorneys fees or other costs covered.  Indeed, to get a "settlement offer" one would have to file a claim and pay arbitration fees and costs before getting the predicable offer.  Even if some customers sought arbitration relief, AT&T remains far-ahead in its financial calculus of the costs and benefits of misrepresenting cell phones as "free."  The *Discover Bank* and *Shroyer* decisions preclude AT&T's efforts to avoid class relief by arbitrarily and unilaterally purchasing Plaintiffs' class action rights.  The Court here should similarly rule.

AT&T also reiterates its argument already rejected by this Court that a ruling that its arbitration provision is unenforceable is preempted by the Federal Arbitration Act ("FAA").  *Shroyer* expressly and conclusively rejected the argument that California law is preempted by the FAA.  AT&T's attempts to buy-out the class action rights for up to $7500 and attorneys' fees do not change the result.  The arbitration provision remains substantively and procedurally unconscionable.

For these reasons, the motion to compel arbitration should be denied.

## II.    FACTUAL BACKGROUND

This action arises from AT&T failing to disclose critical terms in their advertising campaign, *i.e.*, that despite the baiting offer of a "free" phone, once inside the store you are advised that "free" does not mean "free."  Instead, you have to hand over cash or credit card before walking out with your "free" phone.  On or about February 12, 2005, the Defendant charged the Concepcions $149.99 for two cell phones, the first phone discounted by $100 and the second offered for "free," both conditioned on purchase of a two-year cell phone service agreement.  But

2

1   at the point of sale, AT&T demanded from the Concepcions a payment of alleged tax on the "free"

2   phone.  First Amended Complaint ("FAC") ¶ 8.

3        AT&T advertised and marketed, in print and live media, "free" or deeply discounted cell

4   phones in conjunction with the sale of cell phone service.  FAC ¶ 13.  AT&T failed to disclose the

5   fact that sales tax would be charged on the full value of the phone.  AT&T, rather, advertised such

6   offers as "Buy One, Get One Free," "Free After Rebate," "All Phones Free," "Free Out the Door,"

7   "$0 Out the Door," "$29 After Rebate," "$49.99 After Rebate," and "$79 After Rebate."  *Id.*

8        In deciding to purchase the two cell phones and AT&T's service package, the Concepcions

9   relied on the false advertising campaign conducted by AT&T and, further, sustained losses as a

10  result of that reliance.  FAC ¶ 9.  Liza Concepcion received advertisements in the mail from

11  AT&T touting the offer, and both Liza and Vincent Concepcion were told by AT&T

12  representatives at the store that they would receive a free cell phone.  *Id.*

13       Based on this baiting, the Concepcions believed they would not be required to pay

14  anything, including any purported sales tax, for the "free" cell phone or any sales tax on an amount

15  greater than the discounted retail price of the other phone.  *Id.*  AT&T utilized the false advertising

16  and marketing campaign to entice the Concepcions and other consumers like them to shop for and

17  consider signing a service contract in exchange for "free" or deeply discounted cell phones.  *Id.*

18       After AT&T successfully lured the Concepcions and other class members into its stores,

19  the deception continued.  FAC ¶ 10.  Once the Concepcions made their purchase, they received a

20  sales receipt that continued to conceal AT&T's intent to charge and collect sales tax on a phantom

21  price.  *Id.*  AT&T concealed and failed to disclose that the sales tax imposed was based on a

22  hypothetical retail price of the phones, and not the discounted price, by constructing the sales

23  receipt in a way designed to conceal from the consumer the manner in which it calculates sales tax.

24  *Id.*  AT&T utilizes this deceptive receipt in an attempt to avoid responsibility for engaging in the

25  deceptive business practices.  *Id.*

26       AT&T thereby engages in a bait-and-switch tactic, which is then furthered by its deceptive

27  point of sale documentation.  FAC ¶ 11.  By expressly representing to the Concepcions that the

28  phones would be given to them for free or at a discount, AT&T implicitly represented that either

3

1   no sales tax would be payable by the consumer on the "discounted" portion of the price, or that

2   AT&T would pay any applicable sales tax as a cost of obtaining the lucrative service agreement

3   with the consumer.  *Id.*  Once Plaintiffs agreed to purchase the service contract they were still not

4   alerted to the true cost of the phones.  *Id.*  The pertinent portion of the receipt, where the subtotal

5   and sales tax are itemized, identifies a single entry for "sales tax" without any calculation shown

6   of the sales tax, as is common on consumer receipts, and without identifying that the Concepcions

7   were charged sales tax on other than the discounted price of the phones.  *Id.*  For this reason the

8   Concepcions were unaware that AT&T charged them sales tax on the purportedly "free" cell

9   phone or that AT&T calculated sales tax on the other phone at a price different than what they

10  paid. *Id.*

11       At the time the Concepcions entered into the transaction, they were provided with a copy

12  of AT&T's one page "Wireless Services Agreement."   The Agreement Terms and Conditions

13  printed on the back of Mr. Concepcion's copy of the Agreement in a miniscule font states: "[T]his

14  Agreement requires the use of arbitration to resolve any disputes and otherwise limits the remedies

15  available to you" in the provision governing the Agreement.  The Agreement provides:

16          Cingular and you . . . agree to arbitrate all disputes and claims arising out of or
            relating to this Agreement, or to any prior oral or written agreement for Equipment
17          or services between Cingular and you . . . .  A party who intends to seek arbitration
            must first send to the other, by certified mail, a written Notice of Intent to Arbitrate
18          ("Notice") . . . .  If we do not reach an agreement to resolve the claim within 30
            days after the Notice is received, you or Cingular may commence an arbitration
19          proceeding.  After Cingular receives notice at the Arbitration Notice Address that
            you have commenced arbitration, it will promptly reimburse you for your payment
20          of the filing fee. . . .  Except as otherwise provided herein, Cingular will pay all
            [American Arbitration Association ("AAA")] filing, administration and arbitrator
21          fees.  If, however, the arbitrator finds that either the substance of your claim or the
            relief sought in the Demand is improper or not warranted, as measured by the
22          standards set forth in Federal Rule of Procedure 11(b), then the payment of all
            such fees shall be governed by the AAA Rules. . . .  If the arbitrator grants relief to
23          you that is equal to or greater than the value of your Demand, Cingular shall
            reimburse you for your reasonable attorneys' fees and expenses incurred for the
24          arbitration. . . .  You agree that, by entering into this Agreement, you and Cingular
            are waiving the right to trial by jury. . . .  You and Cingular agree that YOU AND
25          CINGULAR MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR
            OR ITS INDIVIDUAL CAPACITY, and not as a plaintiff or class member in any
26          purported class or representative proceeding.  Further, you agree that the arbitrator
            may not consolidate proceedings or more than one person's claims, and may not
27
28

                                                4

> otherwise preside over any form of a representative or class proceeding, and that if this specific proviso is found unenforceable, then the entirety of this arbitration clause shall be null and void.

Berinhout Decl., Ex. 13.

Seven months after the Concepcions executed their prior Wireless Service Agreement ("WSA") with AT&T, and 22 months after they purchased the falsely advertised phones, AT&T unilaterally changed the terms of the WSA to include the broader mandatory arbitration clause and class action waiver at issue.  That clause was actually sent *nine (9) months **after** the Concepcions filed their Complaint in this matter.*  AT&T executed this change through a "bill stuffer" that accompanied the Concepcions' December 2006 wireless bill.[3]

The new provision provides in part:

> You and CINGULAR agree that YOU AND CINGULAR MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, and not as a plaintiff or class member in any purported class or representative proceeding.

Berinhout Decl., Ex. 1.

### III.    PROCEDURAL HISTORY

On March 27, 2006, Plaintiffs Vincent and Liza Concepcion filed a class action complaint. They asserted claims individually and as class representatives under California's Consumers Legal Remedies Act (the "CLRA"), Civil Code §§ 1750, *et seq.*; Unfair Competition Law ("UCL") Business and Professions Code §§ 17200, *et seq.*; California's False Advertising Law ("FAL"), Business and Professions Code § 17500; and unjust enrichment.  On May 6, 2006, Plaintiffs filed a First Amended Complaint adding a request for damages under the CLRA claim based on AT&T's failure to adequately respond to Plaintiffs' demand to rectify its actions pursuant to section 1782 of the CLRA.

On May 25, 2006, AT&T filed a motion to consolidate the Concepcions' FAC with *Laster v. T-Mobile, et al.*, Case No. 05cv1167 DMS (AJB) (S.D. Cal.).  AT&T represented that the "appeal in Laster of this Court's denial of its Motion to Compel Individual Arbitration directly

---

[3]   In order to unilaterally change the terms of the WSA, Cingular took advantage of the broad "change-in-terms clause" existing in every customer's WSA. *See* Def. Mem. at 3, 11, 1-4.

1   relates to any forthcoming motion to compel individual arbitration in the Concepcion case."

2   AT&T Reply Brief (filed August 4, 2006) at 3, 11, 2-4.

3        On September 7, 2006, this Court granted AT&T's motion for consolidation and stay of

4   the cases pending the appeal by AT&T of this Court's denial of AT&T's motion to compel

5   arbitration in the *Laster* action.  This Court noted in its September 7, 2006 Order that "the issues

6   raised in *Laster* concerning the enforceability of such arbitration agreements may well be relevant

7   to, if not dispositive of, any motion to compel arbitration brought by AT&T in Concepcion."

8   September 7, 2006 Order at 4, 11, 20-24.

9        On August 17, 2007, the Ninth Circuit Court of Appeal issued its decision in *Shroyer v.*

10   *New Cingular Wireless Servs., Inc.*, 498 F.3d 976 (9th Cir. 2007), expressly rejecting AT&T's

11   class action waiver as unconscionable and unenforceable under California law.  AT&T withdrew

12   its appeal to the Ninth Circuit in this action based on the *Shroyer* decision.  On October 25, 2007,

13   the Ninth Circuit affirmed this Court's order denying the motion of T-Mobile USA, Inc. to compel

14   arbitration.

15   **IV.**   **ARGUMENT**

16       **A.**   **The New Arbitration Provision Cannot Govern the Present Claims**

17        Apart from its unconscionability, Defendant's "new and improved" arbitration provision

18   cannot be used to compel arbitration in the present case because it was thrust upon consumers nine

19   months after this litigation began.   Class members cannot be forced to arbitrate based on

20   arbitration clauses received after the litigation commenced.  *See Currency Conversion Fee*, 224

21   F.R.D. at 569.  "When a defendant contacts putative class members solely for the purpose of

22   altering the status of pending litigation, such communication is improper without judicial

23   authorization."  *Id.* (citing *Hampton Hardware v. Cotter & Co.*, 156 F.R.D. 630, 632 (N.D. Tex.

24   1994)).

25        For example, in *Long v. Fidelity Water Sys.*, No. C-97-20118, 2000 U.S. Dist. LEXIS 7827

26   (N.D. Cal. May 26, 2000), defendants added an arbitration provision to plaintiffs' contracts after

27   the litigation commenced.  Despite the fact that the credit card application did contain a change of

28   terms provision, the court refused to enforce the provision.  *Id.* at *2.  The court cited both the

1    Ninth Circuit and the U.S. Supreme Court for the proposition that "before a party to a lawsuit can

2    be ordered to arbitrate and thus be deprived of a day in court, there should be an express,

3    unequivocal agreement to that effect." *Id.* at *8 (quoting *Three Valleys Municipal Water Dist. v.*

4    *E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991)); *see also United Steelworkers of Am. v.*

5    *Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960) ("[A]rbitration is a matter of contract and a

6    party cannot be required to submit to arbitration any dispute which he has not agreed so to

7    submit.").   The court took issue with the fact that the defendants had attempted to alter the

8    litigation without so notifying the plaintiff, and it found "no justification for holding that [the

9    plaintiff] agreed to arbitrate acts that occurred before the effective date of that agreement." *Long*,

10   2000 U.S. Dist. LEXIS 7827, at *9-*10.   Therefore, the court refused to apply the arbitration

11   provision retroactively. *Id.* at *10-*11.

12        Similarly here, Defendant thrust its new arbitration provision on Plaintiffs in an effort to

13   preempt the present litigation.   It made no effort to notify Plaintiffs that their rights with respect to

14   their existing claims would be altered, and the Plaintiffs certainly never consented to arbitrate the

15   claims at issue.   As such, the present arbitration provision cannot apply retroactively to the

16   Plaintiffs' claims, and the Court need not consider the unconsionability of the new provision.

17        Furthermore, AT&T's motion impliedly admits that it cannot prevail if based on the

18   arbitration clause in place at the time the Concepcions brought this action and rightly so because

19   that clause has already been deemed unconscionable by this and other courts.   *See infra*,

20   Part IV.C.1.

21        **B.    AT&T's New Provisions Regarding Damage and Attorneys' Fees Premiums**
             **Are Not Dispositive and Fail to Provide the Necessary Relief that**
22           **Aggregation Procedures Can Provide**

23        Should the Court decide to consider the substance of the new provision, like its

24   predecessors, the new provision is also unconscionable.   AT&T's sole basis for distinguishing the

25   2006 "bill stuffer" clause from the predecessor clauses roundly rejected by California state and

26   federal courts, is a purported "premium" awarded to prevailing parties to an arbitration only when

27   their awards exceed AT&T's last written demand.   AT&T's reliance on statements by Professor

28   Nagareda, touting the consumer-friendliness of these provisions, is disingenuous in that Professor

                                            7

1   Nagareda was, in fact, paid by AT&T to help create its new provision.  When looking at the likely

2   nonexistent effect of the new provisions, it becomes clear that the terms of the arbitration

3   provision may be attractive on their face but are really a red herring that only masks the other

4   harmful effects of AT&T's new provision.  *See Ting v. AT&T*, 319 F.3d 1126, 1149 (9th Cir.

5   2003) (courts must look beyond the face of the provision to its actual effects).

6        First, the possibility of a plaintiff actually obtaining a "premium" on their damages is so

7   remote that it cannot properly be considered a prospect for economic gain sufficient to incentivize

8   plaintiffs.  *See Shroyer*, 498 F.3d at 986 ("[W]hen the potential for individual *gain* is small, very

9   few plaintiffs, if any, will pursue individual arbitration or litigation.") (emphasis in original);

10  *Discover Bank*, 36 Cal. 4th at 158-62.  The so-called premium would only be granted if AT&T

11  made a written offer of settlement lower than what is ultimately awarded by an arbitrator.

12  Berinhout Decl., Ex. 1.  This premium cannot actually incentivize consumers because it depends

13  upon actions completely beyond the consumer's control and occurring well after the dispute has

14  arisen.  The premium is not wholly dependant on a finding of liability.[4]  Consumers would have to

15  act more like gamblers rather than rational decision-makers to be incentivized by such

16  contingencies.

17       The "premium," instead, incentivizes AT&T and its teams of lawyers, accountants, and

18  experts to guess accurately at the plaintiff's damages rather than incentivizing the plaintiff to bring

19  their claim in the first place.  This injects gamesmanship into a scenario where one party has vastly

20  greater resources than the other and has the superior bargaining power.  Again, this presupposes

21  that plaintiffs know they have claims in the first place.  For those who are aware of their claims,

22  AT&T then imagines claimants (and lawyers) who will gamble by bringing what is really (for

23  example) a $5 claim in hopes that AT&T will only offer $4.  This will likely never happen.  In the

24

25  [4]  Because liability is not the only pre-requisite needed to trigger the "premium," all attempts by AT&T to equate the premium with statutory penalties should be ignored.  *See* Def. Mem. at 13:13-23; Nagareda Decl. ¶ 14.  Statutory penalties generally represent minimum damage awards that

26  arise coincidentally with a finding of liability.  In the present case, the $7500 is not guaranteed if

27  liability is found.  Rather, it only becomes available if the customer prevails after rejecting AT&T's last settlement offer and is awarded a greater amount than that last settlement offer.

28  AT&T will surely never allow this situation to arise.

1  example of the $5 claim, AT&T would be best served to offer $6, $10, or even $100 just to ensure

2  that they will never pay the full $7500 due under the "premium."   AT&T would have no problem

3  offering these higher amounts because they would recoup the amount by not having to go to

4  arbitration and expend costs and their own attorneys' fees.   Again, the incentive is AT&T's and

5  not the consumer's.   Furthermore, and despite the fact that the 2006 provision has allegedly been

6  in place for 70 million customers for over 15 months, according to its brief, AT&T is unable to

7  point to a single instance where a premium was actually awarded.   That is because the effect now

8  is the same as it ever was: Rational consumers and lawyers are unwilling to expend resources

9  pursuing such minimal gains on an individual basis.

10       For the same reasons, the double attorneys' fees contingency is also a red herring.   First,

11  the *Discover Bank* court expressly rejected the argument being made here by AT&T that

12  provisions in the arbitration agreement allowing recovery of attorneys' fees by the prevailing party

13  is an adequate substitute for the important mechanism of class-wide arbitration.   *Discover Bank*,

14  36 Cal. 4th at 162.   It is important to recognize that these class waivers will eliminate contingency

15  fee arrangements between lawyers and injured plaintiffs.   One third of the potential recovery, even

16  in the mythological "best case" of a $7,500 award, is hardly enough to attract legal representation.[5]

17  Instead, lawyers will charge claimants traditional hourly rates, rates which must be fronted by the

18  claimant without any rational belief such fees will be paid for by AT&T.

19       Unless the $5 claimant opted to represent themselves, he/she would have expended

20  hundreds, maybe thousands of dollars just getting to a stage where AT&T was in a position to

21  make an offer.[6]   Then, what if AT&T makes what would otherwise be an acceptable offer, say $25

22  in the $5 example?   The claimant now has the perverse incentive to reject that reasonable offer

23  because it will not be enough to cover his attorneys' fees.   He will, again, be dependant upon a

---

25  [5]   Even a lodestar method, as contemplated by the AT&T Provision, still begs the question of how

26  much work an attorney can really put toward a case where the claim is really worth $5, $100, or
   even $7,500.

27  [6]   This preliminary stage would likely entail something akin to a "demand letter," including a

28  client interview, a preliminary investigation, and drafting correspondence and forms.

gamble where AT&T holds all of the cards.  Take, for example, a claimant who sustains damages of $5, is offered $25, rejects it and is awarded $10 in arbitration.  This is a claimant who everyone would agree has been injured, has had an otherwise positive result in arbitration, but has eclipsed his recovery with necessary legal fees.[7]  Rational claimants will never choose this approach.  They will either not seek representation or not bring the case in the first place.

The effectiveness of AT&T's provision is demonstrated by the fact that in 14 months, only 570 people have sought to arbitrate out of AT&T's 70 million customers.  Def. Mem. at 6.  There is no evidence of the dollar amounts involved in these claims and no evidence that any of these claims were for deceptive advertising.  This clearly demonstrates the reality that very few people are actually incentivized to chase AT&T for small claims.

Given the realities of the so-called new and improved class waiver and arbitration provision, the new provisions are just as unconscionable as their predecessors.[8]

### C.    AT&T's Arbitration Clause Is Unconscionable Under California Law

Time and again, the courts of California and the Ninth Circuit have struck down defendants' arbitration clauses and class action waivers as unconscionable.  *See Shroyer*, 498 F.3d 976; *Ting*, 319 F.3d 1126; *Steiner v. Apple Computer, Inc.*, No. C 07-04486, 2008 WL 691720 (N.D. Cal. Mar. 12, 2008).  AT&T fails to point to a single case binding upon this Court and holding that a class waiver in a consumer contract of adhesion is enforceable.  AT&T's Motion, rather, takes great pains to distinguish its instant provision from the similar (sometimes identical) provisions struck down as unconscionable.  AT&T's efforts are unavailing.

"'[U]nder both federal and California law, arbitration agreements are valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'"  *Discover Bank*, 36 Cal. 4th at 163 (citation omitted); *Shroyer*, 498 F.3d at 981.  "'It is well-established that unconscionability is a generally applicable contract defense, which may

---

[7]  The 2006 provision does not award fees to *any* prevailing claimant, just the ones who were offered less than what the arbitrator actually awarded or who received no offer at all.

[8]  In fact, the new provisions are even more unconscionable then their predecessor since they are broader.  *See infra*, Part IV.C.2.

1  render an arbitration provision unenforceable.'"  *Shroyer*, 498 F.3d at 981 (citing *Nagrampa v.*

2  *MailCoups Inc.*, 469 F.3d 1257, 1280 (9th Cir. 2006)).

3          Unconscionability refers to "'an absence of meaningful choice on the part of one of the

4  parties together with contract terms which are unreasonably favorable to the other party.'"  *Ingle v.*

5  *Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003) (citing *A&M Produce Co. v. FMC*

6  *Corp.*, 135 Cal. App. 3d 473, 486 (1982)); *see also* Cal. Civ. Code § 1670.5; *Restatement (Second)*

7  *of Contracts* § 208 (1981).

8          Unconscionability has both a procedural and substantive element.  *Discover Bank*, 36 Cal.

9  4th at 160; *Armendariz v. Foundation Health Psychcare Servs.*, 24 Cal. 4th 83, 114 (2000).  Both

10  the procedural and substantive elements must be present for a court to hold that a contract is

11  unenforceable.  *Id.*  Procedural unconscionability concerns the manner in which the agreement was

12  sought or obtained.  *Id.*  Substantive unconscionability, on the other hand, concerns the impact of

13  the term itself and focuses on overly harsh or one-sided results.  *Id.*  Procedural and substantive

14  unconscionability need not be present in the same degree for a contract to be deemed

15  unenforceable.  *Id.*  Rather, a "sliding scale" is invoked, such that the greater the procedural

16  unconscionability, the less evidence of substantive unconscionability is required to conclude that

17  the term is unenforceable, and *vice versa*.  *Id.*  Under the general law of unconscionability in

18  California, as recently articulated in *Discover Bank* and *Shroyer*, AT&T's class-waiver must be

19  struck down.

20          **1.**      **AT&T Provision Is Procedurally Unconscionable**

21          To determine whether an arbitration agreement is procedurally unconscionable, this Court

22  must examine the manner in which the contract was negotiated and the circumstances of the

23  parties at the time.  *Kinney v. United HealthCare Servs., Inc.*, 70 Cal. App. 4th 1322, 1329 (1999).

24  The procedural element focuses on "oppression" or "surprise."  *A&M Produce Co.*, 135 Cal. App.

25  3d at 486.  Oppression arises from an inequality of bargaining power that results in no real

26  negotiation and an absence of meaningful choice.  Surprise involves the extent to which the

27  supposedly agreed-upon terms are hidden in a printed form drafted by the party seeking to enforce

28  them.  *Crippen v. Central Valley RV Outlet, Inc.*, 124 Cal. App. 4th 1159, 1165 (2004).

1       "'The procedural element of an unconscionable contract generally takes the form of a

2    contract of adhesion, which imposed and drafted by the party of superior bargaining strength,

3    relegates to the subscribing party only the opportunity to adhere to the contract or reject it.'"

4    *Shroyer*, 498 F.3d at 982 (citations omitted); *Discover Bank*, 36 Cal. 4th at 160; *Flores v.*

5    *Transamerica HomeFirst*, *Inc.*, 93 Cal. App. 4th 846, 853 (2001) ("A finding of a contract of

6    adhesion is essentially a finding of procedural unconscionability.").[9]  Furthermore, these "take-it-

7    or-leave-it" contracts are procedurally unconscionable even if the customer has a meaningful

8    choice as to phone service providers.  *Shroyer*, 498 F.3d at 985; *Gatton v. T-Mobile USA, Inc.*, 152

9    Cal. App. 4th 571, 585-86 (2007); *Laster v. T-Mobile USA, Inc.*, 407 F. Supp. 2d 1181, 1188 (S.D.

10    Cal. 2005), *aff'd*, No. 06-55010, 2007 U.S. App. LEXIS 25265 (9th Cir. Oct. 16, 2007).

11       Even if having a meaningful choice of alternate service providers was a factor for this

12    Court to consider, it would not apply in the instant case.  The terms of the instant arbitration

13    provision and class waiver were not thrust upon the Concepcions until seven months after they

14    executed their most recent WSA, and almost two years after they purchased the phones at issue, at

15    which point the provision at issue was placed in a "bill stuffer."  The Concepcions' alleged choice

16    to move to a different provider was not triggered, therefore, until well after the Concepcions

17    purchased their phone, and *after* they filed their instant Complaint.  The choice to switch,

18    furthermore, would have cost the Concepcions significant "early termination" fees.  *See* Berinhout

19    Decl., Exs. 14; 15; 16 at 1.

20       It is undisputed that AT&T's arbitration agreement and bootstrapped class waiver are part

21    of a contract of adhesion.  The contract is part of a standard form drafted by AT&T, the party with

22    superior bargaining power, and unilaterally presented to consumers on a take-it-or-leave-it basis.

23    The Concepcions had no opportunity to negotiate the arbitration clause or the class waiver.

24

---

25    [9]  *See also Stirlen v. Supercuts, Inc.*, 51 Cal. App. 4th 1519, 1532 (1997); *Gutierrez v. Autowest,*

26    *Inc.*, 114 Cal. App. 4th 77, 89 (2003) (holding that an arbitration agreement was procedurally unconscionable because it was "printed in eight-point typeface, on the opposite side of the

27    signature page of the lease"); *Harper v. Ultimo,* 113 Cal. App. 4th 1402, 1406 (2003) (finding that an arbitration agreement was procedurally unconscionable for failing to attach the rules governing

28    arbitration to the pre-printed contract).

1    Oppression, therefore, permeates the transaction, and the provision is permeated by procedural

2    unconscionability. *Flores*, 93 Cal. App. 4th at 853; *Gatton*, 152 Cal. App. 4th at 585.

3          The manner in which the disputed clause was presented to the Concepcions established a

4    level of surprise that supports a finding of significant procedural unconscionability.[10]   It is

5    important to recall that at least three different arbitration provisions and two different class waivers

6    potentially applied to the Concepcions. *See* Berinhout Decl. ¶¶ 32-38; Exs. 11-18.   Specifically,

7    the first two WSA's executed by the Concepcions (February 2002 and May 2003) included

8    arbitration provisions on the back of the WSA, printed in block form with small fonts, and

9    sandwiched between sections entitled "VOICE MAIL SERVICE" and "MISCELLANEOUS."

10    Berinhout Decl., Exs. 11, 12.   As such, class members likely never noticed these arbitration

11    provisions and never knew that they had given up their right to pursue potential actions before the

12    courts.   These early WSAs, more importantly, did not contain class action waivers. *See* Berinhout

13    Decl., Exs. 11, 12.   AT&T did not throw that into any agreement with the Concepcions until

14    February of 2005.   Berinhout Decl., Exs. 13, 14.   By the time the Concepcions purchased the new

15    phones at issue, and entered into their February 2005 WSA with AT&T, they had been AT&T

16    customers for about three years.   At no time during these three years had the Concepcions been

17    asked to waive their right to bring a class action.   To the extent that AT&T's Motion suggests that

18    the early Concepcion agreements provided procedural protections related to the class waivers,

19    such suggestions are misleading.

20          Rather, the course of dealing between Concepcion and AT&T for the three years prior to

21    the February 2005 WSA included a right to aggregate their claims with others. *Even if* the

22    Concepcions had noticed the early arbitration clauses, there was nothing in the February 2005

23    WSA that highlighted AT&T's desire to significantly change the deal to which the Concepcions

24    were already accustomed.   That language of the arbitration clause and (first time) class waiver

25    was, again, printed in small, block prolix on the back of the form contract and sandwiched

26

---

27   [10]   AT&T apparently justifies its actions through its change-in-terms clause, which grants it the
unilateral authority to change the terms of the contract as it wishes.   Def. Mem. at 3.   This
28   provision is procedurally unconscionable in and of itself.

1    between innocuous, unrelated, and ancillary sections.  Berinhout Decl., Exs. 13, 14.

2          When AT&T supplanted the February 2005 WSA with a new one in May 2006, the new

3    agreement did not even contain the actual terms of the arbitration clause and relatively new class

4    action waiver.  Berinhout Decl., Ex. 15.  While the May 2006 Service Agreement provided notice

5    of arbitration, it failed to mention the specific terms of arbitration.  The notice never mentioned the

6    class-wide arbitration bar.  Instead, class members could only determine the actual arbitration and

7    class waiver terms by reading a separate document − specifically, pages ten through twelve of

8    AT&T's thirteen-page Terms of Services booklet.  *See* Berinhout Decl., Exs. 15-16.  The

9    arbitration provision was again lengthy and formatted into one long, cumbersome paragraph.  *See*

10   Berinhout Decl., Ex. 16 at 10-12.  These facts were sufficient to establish surprise with respect to

11   AT&T's treatment of other class members in the instant case, including co-plaintiff Elizabeth

12   Voorhies ("Voorhies").  *Laster*, 407 F. Supp. 2d at 1189.  Also like Voorhies, the Concepcions

13   executed the newest (May 2006) WSA through the telephonic "IVR" system, as opposed to

14   physically holding and signing written documents.  *See* Berinhout Decl., Ex. 15.

15         Voorhies and the Concepcions stood, at that point, in a position indistinguishable from the

16   plaintiff in *Shroyer*.  In *Shroyer*, the plaintiff had been an AT&T customer for at least five years

17   prior to bringing his action, had subscribed to service plans on multiple/subsequent occasions, and

18   had executed the contract at issue during an electronic signature process over the telephone.

19   *Shroyer*, 498 F.3d at 979-80.  The same exact documents (WSA and incorporated "Terms of

20   Service" booklet) were at issue.  The arbitration and class waiver clauses were identical.  The

21   Ninth Circuit in *Shroyer* had no difficulty finding the class waiver at issue unconscionable based

22   on California law.  *Id.* at 981.

23         In reality, AT&T is not trying to enforce any arbitration agreement or class-waiver

24   described in the immediately preceding paragraphs.  They cannot because those provisions were

25   struck down as both procedurally and substantively unconscionable.  *Laster*, 407 F. Supp. 2d at

26   1191-92; *see also Shroyer*, 498 F.3d at 981 (same provision).  Those provisions were deemed

27   unenforceable.  *Id.*  Essentially, at the time AT&T purported to amend the WSA with the

28   Concepcions by including the 2006 "bill stuffer" Clause, *there was no arbitration agreement*

                                            14

*between the parties*.

Instead, AT&T is trying to enforce a new, changed arbitration provision allegedly sent to the Concepcions in a "bill stuffer" along with their December 15, 2006 bill, some seven months into their most recent service period.  Berinhout Decl. ¶ 37.  While the Concepcions have no recollection of receiving the "bill stuffer" with their December bill, even if they had received it, the Concepcions did not separately assent to its terms.  There was no new WSA sent along with the December bill.  The Concepcions were given an amendment to their WSA and were deemed to accept that amendment unless they terminated their account under penalty of substantial early termination fees.[11]

By the time the Concepcions received the 2006 arbitration agreement, they had long-since purchased their phones and began performing under the service portion of the agreement.  These facts support an even higher finding of procedural unconscionability than that applicable to Voorhies.  *See Discover Bank*, 36 Cal. 4th at 160 ("bill stuffer" practice properly considered an "element" of procedural unconscionability); *Szetela v. Discover Bank*, 97 Cal. App. 4th 1094, 1100 (2002) (same); *Cohen v. DIRECTV, Inc.*, 142 Cal. App. 4th 1442, 1451 n.10 (2006) (the existence of early termination fees "heighten[s] the evidence of procedural unconscionability").  Given the amount of procedural unconscionability shown above, a lesser showing of substantive unconscionability is required.

**2.     AT&T's Arbitration Provision Is Substantively Unconscionable**

The standard for substantive unconscionability is whether the terms are overly harsh and one-sided such that they lack a "modicum of bilaterality." *Armendariz*, 24 Cal. 4th at 117.  To determine whether an arbitration agreement is sufficiently bilateral, courts look beyond facial neutrality and examine the actual effects of the challenged provisions.  *Ting*, 319 F.3d at 1149.

The California Supreme Court in *Discover Bank* and the Ninth Circuit in *Shroyer* recognized that class action waivers, just as crafted by AT&T, are completely one-sided because the company imposing individual arbitration would never bring a class or representative action

---

[11]   As Defendant's brief points out, consumers can only avoid early termination fees if AT&T increases its prices or restricts its service areas.  *See* Def. Mem. at 3 n.2.

against its customers.  *Discover Bank*, 36 Cal. 4th at 161 (finding that "'it is difficult to envision the circumstances under which the provision might negatively impact Discover [Bank], because credit card companies typically do not sue their customers in class action lawsuits'") (citation omitted); *Shroyer*, 498 F.3d at 982; *see also Ingle*, 328 F.3d at 1171-72, 1176 (stating that the defendant's, Circuit City's, class waiver "is manifestly and shockingly one-sided" given that a company like Circuit City would never "bring a class proceeding against an employee").

As already described above, the present provision is just as unconscionable as its predecessors because its "incentives" are based on a virtually impossible series of events.  In addition, the instant provision is more substantively unconscionable than its predecessors because its scope is much more broad.  To fall under the previous (superseded) arbitration and class waiver provisions, the disputes and claims needed to "aris[e] out of or relat[e] to" the WSA between AT&T and the Concepcions.  *See* Berinhout Decl., Exs. 13, 14.  Under the new, 2006 "bill stuffer" provision, the arbitration provision and class waiver apply to "all" disputes between AT&T and its customers "arising out of or relating to *any aspect of the relationship* between [AT&T and the customer]."  Berinhout Decl., Ex. 1.  Through an eleventh-hour "bill stuffer" AT&T took away many more rights from the putative class than it admits to in its Motion.[12]  Such broad-range, never-before-seen exculpatory language demands higher procedural protections than those outlined above.

While recognizing that class action waivers are not, in the abstract, exculpatory clauses, the California Supreme Court has found such clauses are "indisputably one-sided."  *Discover Bank*, 36 Cal. 4th at 161.  In *Discover Bank*, the court focused on the immunity from liability that a contract clause banning class action relief may provide to an offending business for its harmful business practices.  The court reasoned that "class action waivers found in [adhesive] contracts may also be substantively unconscionable inasmuch as they may operate effectively as exculpatory contract

---

[12]   Ironically, even AT&T's own executives would potentially be subject to the new, broad arbitration and class waiver provisions for any, e.g., workers compensation claims or wrongful termination claims simply because they happen to be AT&T customers too.

clauses that are contrary to public policy." *Id.*[13]   In applying the law of unconscionability, the California Supreme Court summarized and held as follows:

> We do not hold that all class action waivers are necessarily unconscionable.  But when the waiver is found in a consumer contract of adhesion in a setting in which disputes between the contracting parties predictably involve small amounts of damages, and when it is alleged that the party with the superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money, then, at least to the extent the obligation at issue is governed by California law, the waiver becomes in practice the exemption of the party "from responsibility for [its] own fraud, or willful injury to the person or property of another."  (Civ. Code § 1668.)   Under these circumstances, such waivers are unconscionable under California law and should not be enforced.

*Id.* at 162-63.

Following *Discover Bank*, the California Courts of Appeal have struck down the class waivers of Internet providers, credit card issuers, franchisors, and satellite television providers. *See Aral v. EarthLink, Inc.*, 134 Cal. App. 4th 544, 557 (2005); *Klussman v. Cross Country Bank*, 134 Cal. App. 4th 1283, 1289 (2005); *Indep. Ass'n of Mailbox Ctr. Owners v. Superior Court*, 133 Cal. App. 4th 396, 408-10 (2005); *Cohen*, 142 Cal. App. 4th 1442.  These Courts have generally construed *Discover Bank* as providing for a three-part inquiry in order to determine whether a class action waiver in a consumer contract is unconscionable.  *Id.*; *Shroyer*, 498 F.3d at 983.  Courts are required to determine:  (1) whether the agreement is "a consumer contract of adhesion" drafted by a party that has superior bargaining power; (2) whether the agreement occurs "in a setting in which disputes between the contracting parties predictably involve small amounts of damages"; and (3) whether "it is alleged that the party with the superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money."  *Id.* (citation and internal quotations omitted).

First, there is no dispute that the contract signed by the Concepcions was a consumer contract of adhesion drafted by AT&T, who has superior bargaining power.  The Concepcions

---

[13]  California Civil Code § 1668, cited in *Discover Bank*, states that "[a]ll contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."  Cal. Civ. Code § 1668.

were not given an opportunity to negotiate the terms of the WSAs or, beginning with their February 2005 WSA, to execute them without class arbitration waivers.  Instead, and like the plaintiffs in *Shroyer*, the Concepcions could either accept the class action waivers, or opt not to extend their agreements with AT&T.  *See Shroyer*, 498 F.3d at 984.  Even worse here is the fact that, upon receipt of the 2006 Provision, Plaintiffs either had to accept it in full or choose early termination and its significant fees.

Second, the AT&T Agreements occurred "in a setting in which disputes between the contracting parties predictably involve small amounts of damages."  *Discover Bank*, 36 Cal. 4th at 162.  In *Discover Bank*, the plaintiff sought to recover for a $29 fee charged for late payments and other finance charges.  *Id.* at 154.  In *Shroyer*, the plaintiffs alleged individual damages "in the hundreds of dollars."  *Shroyer*, 498 F.3d at 984.  In *Cohen v. DIRECTTV*, plaintiffs sought damages that "may or may not exceed $1000."  *Cohen*, 142 Cal. App. 4th at 1452.  Here, the plaintiffs seek damages that stem from the improper assessment of sales tax (approximately 7.75%) on so-called "free" phones.  Specifically, the Concepcions claim they were overcharged $30.22.  FAC ¶ 4.  This is certainly a "small" sum of damages such that the second *Discover Bank* prong is met.  These amounts nevertheless are significant to consumers and quickly accumulate to large ill-gotten profits for AT&T.

Finally, the Concepcions have alleged that AT&T has "carried out a scheme to deliberately cheat large numbers of consumers out of individual sums of money."  The Concepcion Complaint describes a bait-and-switch leading to a fleece.  *See* FAC ¶ 1.  The Complaint goes beyond alleging merely "unfair" and "unlawful" behavior and describes actionable fraud and fraudulent concealment.  *See*, *e.g.*, FAC ¶¶ 48-54.  The third and final *Discover Bank* prong, therefore, is easily met here.

AT&T's position, if enforced, would have a devastating impact on consumer rights.  Major companies would rapidly redraft the arbitration provisions in their consumer contracts to require each consumer to litigate a claim on an individual basis, thus effectuating a class action waiver.  Following AT&T's cue, corporations could even wait until after their consumers filed lawsuits so long as the corporation could point to a "change in terms" provision in the original contract.

1   Having immunized themselves from suit, the competitive marketplace will inevitably drive these

2   corporations toward more and more abusive behaviors, thus extracting additional illicit profits

3   from their customers without a meaningful opportunity for redress in court.  Those companies that

4   resist the trend will be forced out of the marketplace by competitive disadvantage.  Neither the law

5   of this Court or the California Supreme Court countenances such a result.

6       Given the vast law squarely on point from this Court, the Ninth Circuit, and the California

7   Supreme Court, AT&T's arbitration provision should also be found *substantively* unconscionable.

8       **D.**      **Enforcement of Class Action Waivers Would Undermine the Importance of Class Actions**

9

10       AT&T ignores the vital role class actions serve in California's judicial system.  *See*

11   *Discover Bank*, 36 Cal. 4th at 156 ("'A class action by consumers produces . . . a therapeutic effect

12   upon those sellers who indulge in fraudulent practices, aid to legitimate business enterprises by

13   curtailing illegitimate competition, and avoidance to the judicial process of he burden of multiple

14   litigation involving identical claims.'") (citation omitted); *Keating v. Superior Court*, 31 Cal. 3d

15   584, 609 (1982), *reversed on other grounds sub. nom. Southland Corp. v. Keating*; 465 U.S. 1

16   (1984); *State of California v. Levi Strauss & Co.*, 41 Cal. 3d 460, 471 (1986) ("[T]he consumer

17   class action is an essential tool for the protection of consumers against exploitative business

18   practices."); *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980) ("Where it is not

19   economically feasible to obtain relief within the traditional framework of a multiplicity of small

20   individual suits for damages, aggrieved persons may be without any effective redress unless they

21   may employ the class-action device.").

22       AT&T insists that the Concepcions are not remediless in the absence of classwide

23   arbitration, because claims against AT&T may be pursued in an individual arbitration.  Various

24   courts and commentators have found that individual remedies are not meaningful in these

25

26

27

28

19

circumstances.  *See, e.g., Discover Bank*, 36 Cal. 4th at 162.[14]  AT&T's argument erroneously presupposes that the only disincentive for individual consumers to redress dubious business practices is economic.  The Supreme Court has indicated otherwise, finding that the true problem is a question of time and expense.  Quoting from *Amchem Prods. v. Windsor* 521 U.S. 591, 617 (1997), the court in *Discover Bank* explained:  "'"[S]mall recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.  A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor."'"  36 Cal. 4th at 157 (citation omitted).

In *Keating v. Superior Court*, the court noted that "[i]f the right to a classwide proceeding could be automatically eliminated in relationships governed by adhesion contracts through the inclusion of a provision for arbitration, the potential . . . for chilling the effective protection of interests common to a group[] would be substantial."  31 Cal. 3d at 609.

In *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656 (7th Cir. 2004), the Seventh Circuit stated the proposition even more bluntly:  "It would hardly be an improvement to have in lieu of this single class action 17 million suits each seeking damages of $15 to $30. . . .  The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30."  *Id.* at 661.  As two commentators have noted:

> The court decisions striking class action prohibitions have all emphasized that many small-dollar claims are simply not feasible if brought individually.  In essence, these cases recognize . . . that by increasing plaintiffs' transaction costs, defendants can induce them to accept lower settlements or even drop their claims altogether.  Citing the Supreme Court's oft-stated justification for supporting class actions, courts invalidating class action prohibitions explain that it is often not rational for individual consumers or attorneys to bring small claims, whether through litigation or arbitration.

Jean B. Sternlight & Elizabeth J. Jensen, *Using Arbitration to Eliminate Consumer Class Actions:*

---

[14]  *See also* David S. Schwartz, *State Judges as Guardians of Federalism: Resisting the Federal Arbitration Act's Encroachment on State Law*, 16 Wash. U. J.L. & Pol'y 129, 151 (2004) ("'The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.'  Adhesive, pre-dispute waivers of class action remedies should be void as against public policy, or unconscionable, just like any substantive waiver of a damages remedy.") (quoting *Amchem Prods. v. Windsor*, 521 U.S. 591, 617 (1997)).

1  *Efficient Business Practice or Unconscionable Abuse?*, 67 Law & Contemp. Probs. 75, 85-86

2  (2004).[15]

3       Even if potential plaintiffs would be willing to fight to protect their rights, many claims

4  still will go unremedied in the absence of a class action because, especially as to deceptive

5  practices directed toward unwary consumers, "'[m]any plaintiffs may not know their rights are

6  being violated.'"  *Abels v. JBC Legal Group, P.C.*, 227 F.R.D. 541, 547 (N.D. Cal. 2005) (quoting

7  *Sledge v. Sands*, 182 F.R.D. 255, 259 (N.D. Ill. 1998)).

8       A primary benefit of class actions is that they provide relief to all victims of a defendant's

9  misconduct, regardless of whether the defendant's illegal activities fly under the radar screens of

10  many injured consumers.  That broad relief cannot be replicated on an individual basis unless each

11  potential class member knows that her rights were violated.  Thus, prohibiting class actions and

12  requiring individual actions inevitably would leave many consumers like the class members

13  Plaintiffs represent with no recovery at all for violations of their rights, even if there would be

14  attorneys willing to take their cases.  Only the class procedures heralded in California courts − and

15  their provisions for notifying potential class members − can address these problems.

16       **E.    The FAA Does Not Preempt California Law Regarding Unconscionable
               Contracts**

17

18       Like its unconscionability arguments, AT&T has tried its preemption arguments and failed

19  every time.  AT&T fails to distinguish the instant provision from its predecessors as related to

20  preemption of California law.   As explained more fully above, AT&T's entire preemption

21  argument is based upon new "bill stuffer" arbitration terms whose benefits are actually illusory

22  and only incentivize AT&T.  AT&T's position lacks merit.

23       The FAA recognizes that parties may challenge the enforceability of an agreement "upon

24

25  ─────────────
   [15] S*ee also* Jean R. Sternlight & Elizabeth J. Jensen, *As Mandatory Binding Arbitration Meets the
   Class Action, Will the Class Action Survive?*, 42 Wm. & Mary L. Rev. 1, 81 (2000) (observing
26  some consumer claims only feasible as class actions, including those involving small claims);
   Myriam Gilles, *Opting Out of Liability: The Forthcoming, Near-Total Demise of the Modern
27  Class Action*, 104 Mich. L. Rev. 373, 407 (2005) (noting the class mechanism ban forces the
   putative class member "to assume financial burdens so prohibitive as to deter the bringing of
28  claims" and costs "will exceed the value of the recovery she is seeking").

21

1  such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.

2  Although federal and state courts presume arbitrability, "generally applicable contract defenses,

3  such as fraud, duress or unconscionability, may be applied to invalidate arbitration agreements

4  without contravening [the FAA]."  *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996);

5  *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 281 (1995); *Shroyer*, 498 F.3d at 987.  The

6  focus is not, as AT&T suggests, on the individual words of every arbitration provision tested

7  before California courts.  Rather, the focus is on whether or not California unconscionability law,

8  as articulated in *Discover Bank* and its progeny, is properly viewed as generally-applicable law

9  """"for the revocation of any contract"""" or whether the doctrine impermissibly subjects arbitration

10  clauses to special scrutiny.  *See Shroyer*, 498 F.3d at 987 (quoting 9 U.S.C. § 2).  It is the test itself

11  and not its application to a particular class waiver that is the focus.[16]

12      This Court, the California Supreme Court, and the Ninth Circuit have recently and

13  repeatedly rejected AT&T's same "special scrutiny" arguments.  *See Laster*, 407 F. Supp. 2d

14  1181, *affirmed* No. 06-55010, 2007 U.S. App. LEXIS 2526 (9th Cir. Oct. 16, 2007); *Shroyer*, 498

15  F.3d 976; *Ingle*, 328 F.3d at 1176 n.15; *Ting*, 319 F.3d at 1150 n.15; *Discover Bank*, 36 Cal. 4th at

16  163-66; *see also Armendariz*, 24 Cal. 4th at 114 ("Because unconscionability is a reason for

17  refusing to enforce contracts generally, it is also a valid reason for refusing to enforce an

18  arbitration agreement . . . .").  The U.S. Supreme Court also recently rejected a petition in a case

19  involving similar issues.  *See Circuit City Stores, Inc. v. Gentry*, No. 07-998, 2008 U.S. LEXIS

20  3000 (Mar. 31, 2008).

21      Finally, the U.S. Supreme Court has recognized a strong presumption against preemption

22  of state laws.  In a recent preemption decision, the Court greatly amplified and clarified the scope

---

23  [16]  Of course, a contrary rule would lead to a multiplicity of suits and motions where corporate
24  defendants engaged in never-ending battles to find a preemption "hook" by simply rearranging the
    words of the provisions at issue or adding/deleting terms that have little real effect.  Practically,
25  this Court's preemption focus *must* be on the underlying tests and not the individual arbitration
    agreements themselves.  Furthermore if the focus was to be on the words of the provisions, then
26  this Court must also consider the fact that the invalidation of the arbitration portion of the
27  provision is due to AT&T's *own choice* to make the class waiver non-severable from the
    arbitration agreement.   Stated differently, but-for AT&T's non-severability provision, the
28  mandatory arbitration clause might survive a finding that the *class waiver* is unconscionable.

of this presumption:

> "[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state law causes of action."  In areas of traditional state regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intention "'clear and manifest.'"

*Bates v. Dow Agrosciences L.L.C.*, 544 U.S. 431, 449 (2005) (citations omitted).  The Supreme Court further clarified that when there are two equally plausible readings of a federal statute, courts should adopt the reading that would find no preemption of state law.  *Id*.

The presumption against preemption is particularly applicable here, because contract law is an area traditionally governed by the states, and the common law of unconscionability is an area of almost exclusive state regulation.  While there is a body of federal common law governing contracts in certain narrow areas (such as in collective bargaining disputes governed by federal labor laws or in certain maritime settings), few areas of law have been more deeply entrusted to the states than contract law.[17]

If this Court finds that it is unconscionable for corporations to bar consumers with modest claims from bringing class actions, this holding could hardly be said to conflict with federal law, because just last year Congress made clear that federal law recognizes a necessary role for class actions in some circumstances.  The findings that accompanied the Class Action Fairness Act ("CAFA"), for example, state: "Class action lawsuits are an important and valuable part of the legal system when they permit the fair and efficient resolution of legitimate claims of numerous parties by allowing the claims to be aggregated into a single action against a defendant that has allegedly caused harm."  28 U.S.C. § 1711 note, U.S. Pub. L. 109-2, § 2(a)(1), 119 Stat. 4

---

[17] *See*, *e.g.*, *N. Pipeline Constr. Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 84 (1982) ("[T]he cases before us, which center upon appellant Northern's claim for damages for breach of contract . . ., involve a right created by *state* law . . . ."); *Id*. at 90 (Rehnquist, J. and O'Connor, J., concurring) ("[T]he lawsuit . . . seeks damages for breach of contract . . . which are the stuff of traditional actions at common law . . . .  There is apparently no federal rule of decision provided for any of the issues in the lawsuit; the claims . . . arise entirely under state law."); *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262 (1979) ("Commercial agreements traditionally are the domain of state law.  State law is not displaced merely because the contract relates to intellectual property which may or may not be patentable."); *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 40 (1988) (Scalia, J., dissenting) ("Nor can or should courts ignore that issues of contract validity are traditionally matters governed by state law.").

23

(Feb. 18, 2005). Similarly, the Senate Report that accompanied CAFA stated:

> Class actions were designed to provide a mechanism by which persons, whose injuries are not large enough to make pursuing their individual claims in the court system cost efficient, are able to bind together with persons suffering the same harm and seek redress for their injuries. As such, class actions are a valuable tool in our jurisprudential system.

S. Rep. 109-14 at 4, *reprinted at* 2005 U.S. Cong. Code and Admin. News 3, 5 (Feb. 28, 2005).

Given the importance of class actions in modern society, the presumptions against preemption described above, and the fact that AT&T is unable to in anyway distinguish its prior (failed) express preemption arguments, the application of California unconscionability principles to the class waiver provision at issue is unconscionable would not be preempted by the FAA.

**F.    Plaintiffs' Claims for Injunctive Relief Under the UCL Are Not Arbitrable**

Regardless of the Court's ruling on the enforceability of AT&T's arbitration provision, Plaintiffs' claims for injunctive relief under the UCL cannot be arbitrated. The California Supreme Court has twice held that claims for injunctive relief under the CLRA and the UCL are inarbitrable. *Broughton v. Cigna Healthplans*, 21 Cal. 4th 1066, 1078-80 (1999) ("The CLRA plaintiff in this case is functioning as a private attorney general, enjoining future deceptive practices on behalf of the general public. We hold that under such circumstances arbitration is not a suitable forum, and the Legislature did not intend this type of injunctive relief to be arbitrated."); *Cruz v. PacifiCare Health Systems, Inc.*, 30 Cal. 4th 303, 315-17 (2003) (extending *Broughton* to preclude arbitration of claims for injunctive relief under the UCL); *see also Aral*, 134 Cal. App. 4th at 555.

Here, the Concepcions allege causes of action under UCL, CLRA, and FAL, seeking an injunction precluding future deceptive practices and advertising. The evident purpose of the injunctive relief provision of the UCL and FAL is not to resolve a private dispute but to remedy a public wrong. To that end, the Concepcions seeks an injunction, not to stop AT&T from falsely advertising to her individually, but to stop AT&T from falsely advertising at all. Such an injunction will inure primarily to the benefit of the general public who are in danger of being victimized by the deceptive practices which has already caused damage to the Concepcions.

AT&T cites no cases which overruled or narrow the general rule set forth in *Broughton* and

24

1  *Cruz*, that arbitration is not an appropriate forum to address injunctive relief claims brought by

2  consumers to protect and benefit the public.

3       Under these circumstances, arbitration is not a suitable forum and the Legislature did not

4  intend this type of injunctive relief to be arbitrated.   Should this Court be inclined to compel

5  arbitration in any respect, claims with non-arbitrable remedies such as injunctive relief must be

6  severed from those allegations which are subject to arbitration.

7  **V.     CONCLUSION**

8       Based upon the foregoing, plaintiffs respectfully request that AT&T's motion to compel

9  arbitration be denied.

10  DATED: April 18, 2008                    HULETT HARPER STEWART LLP
                                             KIRK B. HULETT
11                                           SARAH P. WEBER

12

13                                            */s/ Kirk B. Hulett*
                                             KIRK B. HULETT
14

15                                           550 West C Street, Suite 1600
                                             San Diego, CA  92101
16                                           Telephone:    (619) 338-1133
                                             Facsimile:    (619) 338-1139
17

18                                           NICHOLAS & BUTLER, LLP
                                             CRAIG M. NICHOLAS
19                                           MATTHEW B. BUTLER
                                             225 Broadway, 19th Floor
20                                           San Diego, CA  92101
                                             Telephone:    (619) 325-0492
21                                           Facsimile:    (619) 325-0496

22                                           Attorneys for Plaintiffs

23

24

25

26

27

28

25