1

2

3

4

5

6

7

8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

11   JENNIFER L. LASTER, et al.,

12
                              Plaintiffs,

13

14   vs.

15

16

17   T-MOBILE USA, INC., et al.,

18

19

20
                              Defendants.

21

CASE NO. 05cv1167 DMS (AJB)

**ORDER:**

**(1) DENYING ATTM'S MOTION TO COMPEL ARBITRATION AS TO THE CONCEPCION PLAINTIFFS; and**

**(2) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CLAIMS WITH PREJUDICE**

[Docs. Nos. 78, 127, 145]

22        In this putative class action, Plaintiffs assert that Defendants — cellular phone companies and

23   other entities involved with the sale of wireless telecommunication services — have engaged in the

24   unfair and deceptive practice of charging consumers sales tax on the full retail value of cellular phones

25   that were advertised as "free" or at substantial discounts, in violation of California's Unfair

26   Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et. seq.*, and False Advertising Law

27   ("FAL"), Cal. Bus. & Prof. Code § 17500, *et. seq.* In addition, based on these alleged violations,

28   Plaintiffs seek restitution under the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1770,

1    *et. seq.*

2       Presently before the Court are two motions.  First, Defendant AT&T Mobility LLC (formerly

3 Cingular Wireless, abbreviated herein as "ATTM") moves to compel Plaintiffs Vincent and Liza

4 Concepcion to arbitrate their claims, pursuant to an arbitration clause contained in their Wireless

5 Service Agreement ("WSA"). (Doc. 128).  In addition, Defendants T-Mobile USA, Inc., Omni Point

6 Communications, Inc. dba T-Mobile, TMO CA/NC, LLC (collectively, "T-Mobile"); Cellco

7 Partnership dba Verizon Wireless, Verizon Wireless LLC dba Verizon Wireless, Airtouch Cellular dba

8 Verizon Wireless (collectively, "Verizon"); and Go Wireless, Inc. ("Go Wireless") move pursuant to

9 Rule 12(b)(6) to dismiss with prejudice the Second Amended Complaint ("SAC").  (Doc. 78).

10       For the reasons discussed below, the Court denies Defendant ATTM's motion to compel

11 arbitration, and denies Defendants' collective motion to dismiss Plaintiffs' UCL and FAL claims.

12 Further, the Court grants Defendants' motion to dismiss Plaintiffs' CLRA restitution claim with

13 prejudice.[1]

14                              **I.**

15               **FACTUAL AND PROCEDURAL BACKGROUND**

16       Defendants are engaged in the business of marketing and selling wireless telecommunications

17 products, including cellular phones, accessories and service.  These products often are sold as part of

18 a "bundled" transaction, whereby the consumer receives a free or significantly discounted cellular

19 phone, in exchange for agreeing to a wireless service contract for a specified duration.  However, when

20 Defendants offer the free or substantially discounted phone as part of a bundled transaction, they

21 generally charge consumers sales tax (approximately 7.75%) based on the full retail value of the

22 phone.  Plaintiffs contend this practice is improper because Defendants should not charge sales tax

23 on a phone advertised as "free," and should not charge sales tax on the full retail value of a phone

24 advertised at a substantial discount.

25      **A.**      **The Concepcion Plaintiffs and their Arbitration Agreement**

26       In February 2002, Plaintiffs Vincent and Liza Concepcion, allegedly relying upon advertising

27 by ATTM (then Cingular), entered into an agreement for cellular phone service and the purchase of

28

        [1]   Plaintiffs' motion to strike the declaration of Richard Nagareda is denied.  [Doc. 145].

          

cellular phones at a Cingular retail outlet in Carlsbad, California.  In conjunction with the purchase of the service package, the Concepcions were not charged for the phone.  (*Id.*)  However, Defendants charged the Concepcions a total of $30.22 in sales tax, based on the full retail value of the phone.

The Concepcions' WSA incorporates a statement of "Terms and Conditions," which is a one-page, legal-sized paper with approximately 5/16-inch side margins, completely filled with terms printed in small font.  Near the bottom of the page, within a paragraph limiting liability, the word "ARBITRATION" appears in bold, capital letters.  The next sentence cautions the consumer to "read this paragraph carefully."  It then provides that the customer and ATTM (then Cingular) are to "negotiate in good faith to settle any dispute or claim arising from or relating to this Agreement.  If CINGULAR and you do not reach agreement within 30 days, instead of suing in court, CINGULAR and you agree to arbitrate any and all disputes and claims . . . arising out of or relating to this Agreement."  (Berinhout Decl., Exh. 11).  In setting forth the terms of the arbitration, the agreement specifies, "CINGULAR and you agree that no Arbitrator has the authority to (1) award relief in excess of what this agreement provides; (2) award punitive damages or any other damages not measured by the prevailing party's actual damages; or (3) order consolidation or class arbitration."  (*Id.*)  However, under the agreement, "either party may bring an action in small claims court." (*Id.*).

The Concepcions renewed their wireless service on several occasions, including in May 2003 and February 2005.  Each time, they agreed to ATTM's then-current Terms of Service.  Each time, the Terms of Service contained a "change-in-terms" clause, which authorized ATTM to "change any terms, conditions, rates, fees, expenses, or charges regarding your service at any time" and explained that ATTM would "provide [its customers] with notice of such changes . . . either in [their] monthly bill[s] or separately."  (*Id.*, Exh. 16).

On March 27, 2006, the Concepcions filed their Complaint in this Court.  In May 2006, they again renewed their wireless service.  In December 2006, ATTM revised its arbitration provision and mailed the revised version to all customers, including the Concepcions, in an envelope containing their monthly invoice.  ATTM "slightly clarified" the language of the revised provision in January 2007, and included the new provision in the January, February, and March 2007 bills.  The revised version continues to require all disputes between ATTM and its customers to be resolved either in small claims

court or through individual arbitration paid for by ATTM, rather than class-wide arbitration.[2]  (*Id.*, Exh. 2).  However, the new arbitration provision contains significant changes, as follows:

1.   If the arbitrator issues an award in favor of a California customer that is greater than "[ATTM]'s last written settlement offer made before an arbitrator was selected" but less than $7,500, ATTM will pay the customer $7,500 rather than the smaller arbitral award. (The "Premium")

2.   If the arbitrator awards a customer more than ATTM's last written settlement offer, then "[ATTM] will . . . pay [the customer's] attorney, if any, twice the amount of attorneys' fees, and reimburse any expenses, that [the customer's] attorney reasonably accrues for investigating, preparing, and pursuing [his] claim in arbitration."

3.   ATTM "agrees that it will not seek" attorneys' fees and expenses "if it prevails in arbitration," even though "under some laws [ATTM] might have a right to [such an award]."

4.   Punitive damages may be awarded to the same extent such damages would be available in court.

5.   For claims of $10,000 or less, customers have the exclusive right to choose whether the arbitrator will conduct an in-person hearing, a telephonic hearing, or a "desk" arbitration wherein the arbitration is conducted "solely on the bases of documents submitted to the arbitrator."

6.   Arbitration will take place in the county of the customer's billing address.

(*Id.* Exh. 2).  Accordingly, the new arbitration provision provides the customer, among other things, a $7,500 Premium and double attorneys' fees if the customer prevails in arbitration, a right to pursue punitive damages, venue convenient to the customer, and a choice of in-person, telephonic or "desk" (*i.e.*, submitted in writing) arbitration.  In addition, ATTM agrees to waive recovery of its attorney's fees and costs if it prevails in arbitration.

---

[2]  The new arbitration provision, as well as the former provision, provide: ATTM will pay "all [American Arbitration Association ("AAA")] filing, administration and arbitrator fees" unless the arbitrator determines that the claim "is frivolous or brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b))."  Any such costs are capped at $125. (AAA Consumer Procedures § C-8).

According to ATTM, the "vast majority of disputes" never reach arbitration, because ATTM's customer service department resolves the disputes by phone or e-mail.  For example, in 2007, ATTM provided over $1.3 billion in manual credits to resolve customer concerns and complaints.  (Motion to Compel at 5, citing Berinhout Decl. ¶ 16).  A customer whose concerns are not satisfactorily resolved can take the next step – as required by the arbitration provision – and provide ATTM's legal department with notice of the dispute.  To begin this process, a customer may send a letter or fill out a one-page "Notice of Dispute" form that may be obtained from ATTM's website.  On the Notice of Dispute, the customer provides basic contact information, and a brief description of the nature of the dispute and the relief sought.  (*Id.,* Exh. 8).  ATTM generally responds to the Notice of Dispute form by making a settlement offer within 30 days of receiving the form.  The process initiated by mailing the Notice of Dispute is fairly characterized as an "informal claims process."  If the dispute is not resolved to the customer's satisfaction at this stage, the customer may submit a one-page "Demand for Arbitration" form to AAA and ATTM.  The demand form is available on the websites of both AAA and ATTM.  (*Id.*).  Also posted on ATTM's website is a layperson's guide on how to arbitrate a claim.  (*Id.*, Exh. 3).  Between December 23, 2006 and February 8, 2008, ATTM received over 570 Notices of Dispute and Demands for Arbitration.  (*Id.* at 5, citing Berinhout Decl. ¶ 19).

**B.     The Voorhies and Laster Plaintiffs**

On November 14, 2004, relying upon Cingular's advertisement for a free phone, Elizabeth Voorhies entered into a bundled transaction to obtain a new cellular phone and wireless service from Cingular, through its authorized agent, Go Wireless, in Poway, California.  (SAC ¶ 5).  In conjunction with the purchase of the service package, Voorhies was not charged any amount for the phone.  (*Id.*)  However, Defendants charged Voorhies a total of $10.31 in sales tax, based on the retail value of the phone.  (*Id.*)

On February 23, 2005, relying upon T-Mobile's advertized free phone, Jennifer Laster entered into a bundled transaction with T-Mobile at its Mission Valley Center Store in San Diego, California, whereby she purchased a new phone and activated cellular service.  (SAC ¶ 3).  At some time during the sales transaction, Laster received a one-page transaction receipt which indicated, among other things, that while T-Mobile did not charge any amount for the phone, it was charging $28.22 for sales

1   tax based on the full retail value of the phone. (*Id.* ¶ 22).

2       **C.      Procedural History**

3       In May 2005, Laster, Voorhies, and an additional named Plaintiff, Andrew Thompson, each

4   filed suits in the Superior Court of San Diego County.  Subsequently, Laster's and Voorhies's cases

5   were removed to this Court pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C.

6   §§ 1711, *et. seq.*  Thompson's case was dismissed without prejudice.

7       On August 12, 2005, Laster and Voorhies filed a First Amended Complaint against Defendants.

8   They alleged for themselves and on behalf of all consumers who purchased a cellular phone as part

9   of a bundled transaction, that Defendants' practice of advertising "free" or significantly discounted

10  phones, while charging sales tax on the full retail value of the phones, constitutes misleading and

11  unlawful business acts and practices under California's FAL, UCL and CLRA.  On November 30,

12  2005, the Court addressed motions brought by Cingular and T-Mobile to compel Laster and Voorhies

13  to arbitration, and motions by all Defendants to dismiss the FAC pursuant to Federal Rule of Civil

14  Procedure 12(b)(6).  The Court denied the motions to compel, finding the arbitration agreements to

15  be procedurally and substantively unconscionable under California contract law.  The Court further

16  determined that the Federal Arbitration Act did not preempt California contract law.  In addition, the

17  Court granted the motions to dismiss the FAC as follows: The UCL and FAL claims were dismissed

18  with leave to amend because Plaintiffs failed to allege they relied upon the alleged misrepresentations

19  in deciding to purchase Defendants' cell phones.  (Order, Doc. 61 at 17).  The CLRA claim was

20  dismissed with prejudice because Plaintiffs failed to comply with the statutory notice requirement set

21  forth in California Civil Code § 1782.  (*Id.* at 18).

22      On December 22, 2005, ATTM and T-Mobile appealed the Court's order denying their motion

23  to compel arbitration, and moved for a stay of proceedings pending appeal.  (Doc. 65-68).  The other

24  Defendants joined in the motion.  (Doc. 81, 83).  On December 30, 2005, Plaintiffs filed a Second

25  Amended Complaint.  (Doc. 70, "SAC").  On January 19, 2006, Defendants filed the instant motion

26  to dismiss the SAC, (Doc. 78), and on February 8, 2006, Plaintiffs opposed both the motion to dismiss

27  and the motion to stay proceedings pending appeal.  (Doc. 86, 88).  On March 14, 2006, the Court

28  granted the motion for stay pending appeal.  (Doc. 98).  On September 7, 2006, the Court briefly lifted

1  the stay to consolidate *Concepcion v. Cingular Wireless LLC*, (Case No. 06cv0675) with the *Laster*

2  case.  The Court then re-imposed the stay pending appeal on all consolidated actions.  (Doc. 109).

3  On August 17, 2007, the Ninth Circuit Court of Appeals in *Shroyer v. New Cingular Wireless*

4  *Services*, held that a class arbitration waiver in Cingular's standard contract for cellular phone services

5  was unconscionable under California law and that the Federal Arbitration Act did "not preempt a

6  holding that the waiver is unenforceable."  498 F.3d 976, 978 (9th Cir. 2007).  Because the class

7  arbitration waiver in *Shroyer* is substantively identical to the waiver provision that this Court found

8  to be unconscionable in *Laster,* the Court of Appeals ordered all parties to "file simultaneous letter

9  briefs . . . discussing the effect, if any, of [*Shroyer*]" on the appeal.  (Doc. 110).  In response, on

10  September 28, 2007, all Defendants save T-Mobile voluntarily dismissed their appeals.  (Doc. 111).

11  In T-Mobile's remaining appeal, the Ninth Circuit affirmed this Court's order in an

12  unpublished memorandum dated October 25, 2007. (No. 06-55010).  On January 25, 2008, T-Mobile

13  sought review of the Ninth Circuit's decision in the Supreme Court of the United States.  (Doc. 114).

14  This Court thereafter held a status conference on February 5, 2008, at which the previously imposed

15  stay pending appeal was lifted.  The Court granted the parties' request to supplement the motion to

16  dismiss the SAC, which was heard on May 30, 2008.  On May 27, 2008, the United States Supreme

17  Court denied T-Mobile's petition for certiorari. (Doc. 151).

18  In the meantime, on March 13, 2008, ATTM filed a motion to compel the *Concepcion*

19  Plaintiffs to individual arbitration, arguing they are subject to a class arbitration waiver that is

20  substantively distinct from the waiver rejected by both this Court in *Laster* and the Ninth Circuit in

21  *Shroyer*.  (Doc. 127).  All motions have been fully briefed, and oral argument was heard on the

22  motions on May 30, 2008.

**II.**

**DISCUSSION**

**A.**  **Motion to Compel Arbitration**

**1.**  **Legal Standard**

27  The Federal Arbitration Act ("FAA") governs arbitration agreements in contracts involving

28  transactions in interstate commerce.  9 U.S.C. § 1; *Moses H. Cone Mem'l Hosp. v. Mercury Constr.*

*Corp.*, 460 U.S. 1, 25 n.32 (1983).  Congress intended courts to construe commerce as broadly as possible.  *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999).  Pursuant to Section 2 of the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds that exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  In determining whether to compel a party to arbitration, a district court may not review the merits of the dispute; rather, the court must limit its inquiry to: (1) whether a valid agreement to arbitrate exists, and, if it does (2) whether the agreement encompasses the dispute at issue.  *Chiron Corp. v. Ortho Diagnostic Sys., Inc.,* 207 F.3d 1126, 1130 (9th Cir. 2000).  Finally, a court interpreting an arbitration agreement must give due regard to the federal policy favoring arbitration; ambiguities as to the scope of the arbitration clause are resolved in favor of arbitration.  *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995); *AT&T Techs. Inc. v. Comm. Workers of America*, 475 U.S. 643, 650 (1986) ("in the absence of any express provision excluding a particular grievance from arbitration . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.")

ATTM contends the Concepcions are bound by the terms of the arbitration agreement contained in their wireless service agreement, and therefore, this Court is not the proper forum to adjudicate their claims. The Concepcions argue the arbitration provision is not enforceable against them for two reasons: (1) the December 2006 revised arbitration provision does not apply because it was revised after the Concepcions had filed the instant lawsuit, and (2) even if the revised provision is applicable, it (like the original provision) is unconscionable and thus, unenforceable under California law.

### 2.    The Provision at Issue

Plaintiffs first argue the applicable class arbitration waiver is the one that existed at the beginning of this lawsuit in March 2006.  Because that provision has been held to unconscionable by this Court and the Ninth Circuit in *Shroyer*, Plaintiffs argue the Court must deny ATTM's motion to compel.  ATTM argues the revised arbitration provision modified the original service contract between the parties and, as such, applies to the "existing claims" between the parties.  The parties dispute whether the revised arbitration provision applies, as it purports to retrospectively modify the original service contract after the present litigation had already begun.  (Reply at 1, citing Opp. at 1.)

Both Federal and California law support ATTM's argument that the 2006 revision applies. Under the FAA, "an agreement in writing to submit to arbitration an *existing controversy* arising out of . . . a contract or transaction . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2 (emphasis added). Thus, several district courts have enforced revisions to an arbitration provision made after litigation has begun, so long as the terms of the agreement reflect that intent. *See, e.g. Enderlin v. XM Satellite Radio Holdings, Inc.,* 2008 WL 830262, at *7 (E.D. Ark., March 25, 2008) (collecting cases); *Goetsch v. Shell Oil Co.,* 197 F.R.D. 574, 577-79 (W.D. N.C. 2000) (compelling individual arbitration based on terms of provision that had been revised to add a class waiver after the commencement of litigation). ATTM's 2006 provision plainly applies to "**all disputes and claims** between us . . . including . . . claims that arose before this or any prior Agreement . . . [and] claims that are currently the subject of purported class action litigation in which you are not a member of a certified class...." (Berinhout Decl. Exh.1, at 2). (emphasis in original). Accordingly, under Federal Law, the revised arbitration agreement applies.

Plaintiffs argue the purported modification is ineffective because it was implemented through improper contact between Defendants and members of a class action, which this Court may regulate under Federal Rule of Civil Procedure 23(d). *See In re Currency Conversion Fee Antitrust Litigation*, 224 F.R.D. 555, 569 (S.D.N.Y. 2004). In *Currency Conversion*, the district court used its supervisory power under Rule 23(d) to refuse to enforce an arbitration provision that was retroactively imposed upon certain plaintiffs in a pending class action who were not subject to an arbitration agreement of any kind at the beginning of the litigation. Here, in contrast, the Concepcion Plaintiffs were not singled out for receipt of the revised agreement. Instead, ATTM included the revision in a mailing to all its customers. Moreover, unlike the plaintiffs in *Currency Conversion,* the Concepcion Plaintiffs agreed to arbitration at the time of the initial WSA. The revised agreement merely modified that provision.

Enforcing the modification is also consistent with California contract law. A "change-in-terms" provision authorizes a party to modify the terms of a contract unilaterally, as long as the exercise of that power is consistent with the covenant of good faith and fair dealing. *Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 795-96 (1998). Here, the initial WSA contained an arbitration clause

1  and class action waiver, as did each and every WSA entered into by the Concepcions before the 2006

2  revision.  This unilateral change did not add a new term; it merely modified an old one.  *Compare*

3  *Long v. Fidelity Water Sys.*, 2000 U.S. Dist. LEXIS 7827, *8 (N.D. Cal. 2000) (refusing to apply an

4  after-the-fact arbitration clause when no such clause existed at the time litigation commenced).  The

5  terms of arbitration also were modified more favorably to Plaintiffs.  As such, the modification is not

6  unreasonable under California law.

7  **3.    Unconscionability**

8  While federal policy favors arbitration agreements, federal courts rely on state law when

9  addressing issues of contract validity and enforceability.  *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d

10  931, 936-37 (9th Cir. 2001).  Thus, generally applicable contract defenses such as fraud, duress, or

11  unconscionability, may be applied to invalidate arbitration agreements without contravening Section

12  2 of the FAA.  *Ticknor*, 265 F.3d at 937 (citing *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 686

13  (1996)).  On a motion to compel arbitration, the trial court does not determine whether the contract as

14  a whole is unconscionable.  Instead, the court is limited to determining whether the arbitration clause

15  itself is unconscionable.  *See Gray v. Conseco, Inc.*, 2000 WL 1480273 (C.D.Cal. 2000).

16  "Under California law, a contract provision is unenforceable due to unconscionability only if it

17  is both procedurally and substantively unconscionable."  *Shroyer*, 498 F.3d at 981 (citing *Discover Bank*

18  *v. Superior Court*, 36 Cal. 4th 148, 153 (2005)).  Procedural unconscionability focuses on "oppression

19  or surprise due to unequal bargaining power," and substantive unconscionability focuses on "overly harsh

20  or one-sided results."  *Id.*  Procedural and substantive unconscionability, however, "need not be present

21  in the same degree."  *Id.*  "California courts apply a sliding scale, so that the more substantively

22  oppressive the contract term, the less evidence of procedural unconscionability is required to come to

23  the conclusion that the term is unenforceable, and vice versa."  *Id.* (citations and internal quotations

24  omitted).  A party challenging an arbitration agreement has the burden of proving both procedural and

25  substantive unconscionability.  *Crippen v. Central Valley RV Outlet, Inc.*, 124 Cal. App.4th 1159, 1165

26  (2004).

27  As discussed, both this Court and the Ninth Circuit in *Shroyer* addressed, and struck down,

28  ATTM's first attempt at imposing a class arbitration waiver on its customers.  In *Shroyer*, the court

noted the Ninth Circuit previously struck down class waiver provisions in related situations. 498 F.3d at 981 (citing *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1176 (9th Cir. 2003) (class arbitration waiver in employment contract held unconscionable) and *Ting v. AT&T*, 319 F.3d 1126, 1150 (9th Cir. 2003) (class arbitration waiver in contract for telephone services held unconscionable)).   Such contracts have been found to be procedurally unconscionable because of "the adhesive nature of the contract," and substantively unconscionable because of "the imposition of a one-sided and oppressive class action waiver provision." *Shroyer*, 498 F.3d at 981 (citations omitted).  *See also Ingle*, 328 F.3d at 1176 (Circuit City's class arbitration waiver "is manifestly one-sided" given that the company would never "bring a class proceeding against an employee").

Following *Ingle* and *Ting*, the California Supreme Court in *Discover Bank*, 36 Cal. 4th at 153, held that "at least in some circumstances, the law in California is that class action waivers in consumer contracts of adhesion are unenforceable, whether the consumer is being asked to waive the right to class action litigation or the right to classwide arbitration."  The court in *Discover Bank* outlined the circumstances under which a class waiver provision in an adhesion contract may be subject to a finding of procedural and substantive unconscionability under California law:

> [W]hen the waiver is found in an consumer contract of adhesion in a setting in which disputes between the contacting parties predictably involve small amounts of damages, and when it is alleged that the party with superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money, then, at least to the extent the obligation at issue is governed by California law, the waiver becomes in practice the exemption of the party from responsibility for [its] own fraud . . . . (Civ. Code § 1668).  Under these circumstances, such waivers are unconscionable under California law and should not be enforced.

*Id.* at 162.

Based on the above language, the Ninth Circuit and California courts have construed *Discover Bank* as providing a three-part inquiry to determine whether a class waiver in a consumer contract is unconscionable: (1) whether the agreement is a consumer contract of adhesion drafted by a party of superior bargaining power; (2) whether the agreement occurs in a setting in which disputes between the contracting parties predictably involve small amounts of damages; and (3) whether it is alleged that the party with the superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money." *Shroyer*, 498 F.3d at 983

(citations omitted).  At the heart of this three-pronged inquiry is a concern that a party such as ATTM may "exempt" itself from wrongdoing through the imposition of a one-sided class waiver provision.  As noted in *Discover Bank*, "class action waivers in such [consumer] contracts may... be substantively unconscionable inasmuch as they may operate effectively as exculpatory contract clauses that are contrary to public policy."[3]  36 Cal.4th at 161.  The court in *Discover Bank* emphasized this point by stating: "[B]ecause . . . damages in consumer cases are often small and because '[a] company which wrongfully exacts a dollar from each of millions of customers will reap a handsome profit,' . . . 'the class action is often the only effective way to *halt and redress* such exploitation.'"  *Id.* (citation omitted) (emphasis added).  "Fully aware that few customers will go to the time and trouble of suing in small claims court" or "pursuing other legal remedies," companies with superior bargaining power have "sought to create for [themselves] virtual immunity from class or representative actions despite their potential merit, while suffering no similar detriment to [their] own rights."  *Id.* at 159 (citing *Szetela v. Discover Bank*, 97 Cal.App.4th 1094, 1100-01 (2002)).  As noted in *Shroyer*, the court in *Discover Bank* "was concerned that when the potential for individual *gain* is small, very few plaintiffs, if any, will pursue individual arbitration or litigation," *Shroyer*, 498 F.3d at 986 (original emphasis), and thus class litigation or arbitration (or some other "adequate substitute") is necessary to effectively halt and redress such potential exploitation.

Accordingly, for a class waiver in a consumer contract of adhesion to withstand scrutiny (*i.e.,* not to be found substantively unconscionable), *Discover Bank* demands that the contract provide an "adequate substitute for the class action or arbitration mechanism."  36 Cal.4th at 162.  In determining whether ATTM's revised arbitration provision provides an "adequate substitute," this Court must consider the benefits of class action litigation and classwide arbitration as articulated by *Discover Bank*.

---

[3] The public policy referenced in *Discovery Bank* is embodied in California Civil Code § 1668, which provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

05cv1167 DMS (AJB)

First, *Discover Bank* noted the class mechanism facilitates redress to individuals whose recovery "would be insufficient to justify bringing a separate action." 36 Cal.4th at 156. Second, *Discover Bank* noted the class mechanism "produces several salutary by-products including a *therapeutic effect* upon those sellers who indulge in fraudulent practices. . . ." *Id.* (emphasis added). Finally, *Discover Bank* noted generally that (a) the availability of attorney fees to the prevailing party in arbitration is an insufficient substitute for class litigation or arbitration, and (b) "small claims litigation, government prosecution, or informal resolution" of claims involving small amounts of damages are not adequate substitutes for class litigation or arbitration. *Id.* Notably, however, the court declined to hold that class waiver provisions are *void* as against public policy (or *per se* invalid), only that they are *voidable*. The court noted: "We do not hold that all class action waivers are necessarily unconscionable." *Id.*

The question presented, therefore, is whether the arbitration provision now before the Court sufficiently addresses the concerns of *Discover Bank* and provides an adequate substitute for class litigation or arbitration. For the reasons set forth below, the Court concludes it does not.[4]

### a.    Contract of Adhesion

As noted, "[t]he procedural element of an unconscionable contract generally takes the form of a contract of adhesion, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Discover Bank*, 36 Cal. 4th at 160. In its November 30, 2005 Order, this Court found that ATTM's original arbitration agreement was a contract of adhesion but noted the contract was presented to the Plaintiffs at the time of purchase (rather than in a subsequent mailer after the consumer had already purchased and activated the phone). Under such circumstances, ATTM's contract was found to be "on the low end of the spectrum of procedural unconscionability." (Order, Nov. 30, 2005 at 9). Although the revised terms of the arbitration agreement were mailed to the Concepcions after they purchased the phone, the original (less favorable) arbitration provisions were presented at the time of purchase. The subsequent mailer merely altered the existing agreement in a way that made the arbitration provisions

---

[4] At least one other court has addressed the arbitration provision in question and held it to be unconscionable under California law. *Steiner v. Apple Computer, Inc.*, 556 F.Supp.2d 1016 (N.D.Cal. 2008).

1   more favorable to the Concepcions.  Accordingly, the Court finds that ATTM's arbitration agreement

2   with the Concepcions is on the low end of the spectrum of procedural unconscionability.

3                               *b.*    *Predictably Small Amounts of Damages*

4        The presence of predictably small amounts of damages (or individual gain) invokes the concern

5   of *Discover Bank* that without class litigation or arbitration, individuals have no "method of obtaining

6   redress for claims which would otherwise be too small to warrant individual litigation." *Discover Bank*,

7   36 Cal. 4th at 157.  If an individual's expected damages are so small as to make arbitration or litigation

8   impractical, a class waiver is unconscionable "to the extent [it] operate[s] to insulate a party [with

9   superior bargaining power] from liability." *Id.* at 161.

10       This Court found ATTM's original arbitration provision met the "predictably small amounts

11   of damages" prong of the *Discover Bank* test because in the context of Plaintiffs' deceptive advertising

12   claim, a consumer who pursues arbitration generally could recover no more than $30: the sales tax on

13   the original retail price of a cellular phone.  (Order, Nov. 30, 2005 at 11).  In addition, ATTM's

14   agreement to pay (sometimes significant) arbitration costs regardless of who prevailed,[5] as well as

15   attorney fees to the prevailing party, did not change the result, because even if a consumer incurred no

16   monetary cost, the expenditure of time, effort and emotional resources to pursue arbitration outweighed

17   the minuscule benefits of arbitration.  As Judge Richard Posner famously observed, "only a lunatic or

18   a fanatic sues for $30." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656 (7th Cir. 2004).  The net effect:

19   the arbitration provision and class action waiver operated to preclude recovery for ATTM's customers

20   with disputes involving small amounts of damages.  Such customers would not bother to pursue

21   individual litigation or arbitration, and if precluded from participation in classwide litigation or

22   arbitration, would effectively have no redress.

23       While the new arbitration provision does not change the amount of actual damages at issue

24   ($30), it does exponentially change the amount of potential recovery in arbitration.[6]  If ATTM denies

25

26        [5] The minimum cost for "in-person" arbitration is $1,700: $750 in administrative fees, a $200

27   case service fee, and $750 in arbitrator fees.  (Motion to Compel at 15, n. 13.)

28        [6] $7,500 is the amount of the Premium in California because it is the maximum allowable recovery in small claims court.  The amount changes based upon the small claims limit in the relevant jurisdiction.

        05cv1167 DMS (AJB)

an informal claim (*i.e.,* the Notice of Dispute) or offers less than the consumer requests – which are the only scenarios that would prompt a consumer to pursue arbitration – the amount of the consumer's award upon prevailing at arbitration jumps to $7,500 (the "Premium") plus double attorney's fees, if the consumer is represented by counsel.  With the potential to recover two hundred fifty times one's actual damages, ATTM argues individual claimants are much more likely to pursue arbitration if they are unsatisfied with ATTM's offer during the informal claims process.  The Court agrees.

Plaintiffs argue the *potential* for recovery of the $7,500 Premium and double attorneys' fee is "so remote" as to be illusory because, in the informal claims process, ATTM will simply *pay* its customers' demand in full rather than incur costs of arbitration (approximately $1,700 for in-person arbitration), as well as Premium-based damages ($7,500) and double attorney's fees.[7]  (Oppo. to Motion to Compel at 8-9).  ATTM's self-interest, according to Plaintiffs,  is "best served" by offering the consumer his or her full demand so ATTM "will never pay the full $7500 due under the 'premium.'" (Oppo. to Motion to Compel at 9.)  Because the Premium "only becomes available if the customer prevails after rejecting [ATTM's] last settlement offer and is awarded a greater amount than that last settlement offer," Plaintiffs predict, "[ATTM] will surely never allow this situation to arise."  (*Id.* at 8, n.4).

Plaintiffs' argument actually supports ATTM's position for two reasons.  First, Plaintiffs acknowledge that the new provision prompts ATTM to *accept liability*, rather than "escape liability," for small dollar claims made during the *informal claims process* (even for claims of questionable merit and for claims it does not owe).  Plaintiffs complain that if ATTM is faced with even a "$5 claim" it "would be best served to offer $6, $10, or even $100 just to ensure [it] will never pay the full $7,500 due under the Premium."  (Opp. to Motion to Compel at 9.)  By this argument, however, Plaintiffs acknowledge that as a result of the Premium, a consumer is virtually guaranteed a payment by ATTM of up to twenty times ("$100" for a "$5 claim") his or her actual damages simply by filling out a one-

---

[7]  As ATTM notes, a consumer's Notice of Demand may include a request for attorney's fees as the attorney fee provision in question "supplements" any right to such fees that the customer may have under applicable law.  Thus, a customer who prevails on a statutory claim that allows for attorney's fees is entitled to a fee award, and the fee is doubled if the arbitrator awards the customer more than ATTM's last written settlement offer.  Accordingly, ATTM has an incentive to include reasonable attorney's fees in its settlement offers, and has a policy of doing so.  (Reply to Motion to Compel at 6.)

1  page form to initiate the informal claims process.

2      If ATTM resolves its customer's claims through prompt payment, and does so for fear of being

3  subjected to its contract-based $7,500 Premium, the Premium has served a noble purpose, even if no

4  customer ever actually receives it.  The customer will have been made whole, or at least satisfied, and

5  with minimal effort, as he or she need only fill out and mail a one page Notice of Demand which is

6  readily accessible on ATTM's website.  The process is quick, easy to use, and prompts full or, as

7  described by Plaintiffs, even excess payment to the customer *without* the need to arbitrate or litigate.

8  In this way, the revised arbitration provision  sufficiently incentivizes consumers in disputes involving

9  small dollar amounts to pursue ATTM's informal claims process.

10     Second, if the informal claims process fails, the $7,500 Premium is available to induce the

11 consumer to pursue individual arbitration.  Notably, Plaintiffs do not argue that the $7,500 Premium

12 will not apply, or is insufficient to induce a customer to pursue arbitration, if a claim is not resolved

13 during the informal claims process.  It is therefore evident that if ATTM does not resolve the claim

14 informally and to the consumer's satisfaction, the $7,500 Premium remains available as a substantial

15 inducement for the consumer to pursue the claim in arbitration.[8]

16     The next issue is whether the arbitration provision adequately addresses the "policy at the very

17 core of the class action mechanism . . . to overcome the problem that small recoveries do not provide

18 the incentive for any individual to bring a solo action prosecuting his or her rights."  *Discover Bank*,

19 36 Cal.4th at 157 (citing *Amchem Products, Inc. V. Windsor*, 521 U.S. 591, 617 (19197)).  Plaintiffs

20 argue that a "class action solves this problem by aggregating the relatively paltry potential recoveries

21 into something worth someone's (usually an attorney's) labor."  (Oppo. to Motion to Compel at 20,

22 quoting *Discover Bank*, 36 Cal.4th at 157 (citations omitted).

23     As discussed, under the revised arbitration provision, nearly all consumers who pursue the

24 informal claims process are very likely to be compensated promptly and in full.  In contrast, it appears

25 that consumers who are members of a class do not fare as well.  To recover, individual class members

26

---

27     [8]  In *Steiner v*, 556 F.Supp.2d at 1030, the court concluded that the Premium is illusory and
28 thus, an insufficient incentive for individuals to pursue *arbitration*.  The court, however, did not
   address the effect of the Premium as an incentive for individuals to pursue the *informal claims process*.

1   generally must file a claim form similar to that contemplated by ATTM's informal claims process.  But

2   the incentive for a class member to file a claim form is low.  ATTM cites studies that show class

3   members rarely receive more than pennies on the dollar for their claims, and that few class members

4   (approximately 1-3 %) bother to file a claim when the amount they would receive is small.  (Motion

5   to Compel at 14, n. 12.)  Plaintiffs do not dispute these statistics.  What class actions *actually* offer to

6   individual consumers with small dollar claims is highly relevant to the determination of whether a

7   proposed alternative procedure is an adequate substitute for class litigation or arbitration.

8          ATTM argues its arbitration procedure is an adequate substitute to the class mechanism:

9   "[T]here is nothing unfair about the tradeoff that [ATTM's] customers make: In exchange for

10  relinquishing the ability to bring or join a class action, customers receive a dispute resolution

11  mechanism that affords them either a quick settlement offer that often will amount to a full recovery,

12  or cost-free arbitration that provides them with the potential for a significant 'individual gain' in the

13  form of a $7,500 premium – an amount that substantially exceeds the size of claims they might make."

14  (Reply Brief at 7.)   The new arbitration provision "allows both customers and ATTM to win:

15  Customers' claims are resolved quickly and fully, and ATTM achieves significant savings on

16  transaction costs (which in part are passed on to customers) while retaining good relations with its

17  customers."  (Reply Brief at 7.)  The Court agrees.

18         Given the unrebutted class action statistics above – pennies on the dollar with few consumers

19  actually submitting claims in class litigation – as well as Plaintiffs' concession that the Premium

20  prompts early payment of small dollar claims, the record before the Court demonstrates that a

21  reasonable consumer may well prefer quick informal resolution with likely full payment over class

22  litigation that could take months, if not years, and which may merely yield an opportunity to submit a

23  claim for recovery of a small percentage of a few dollars.  Because the arbitration provision provides

24  sufficient incentive for individual consumers with disputes involving small damages to pursue (a) the

25  informal claims process to redress their grievances, and (b) arbitration in the event of an unresolved

26  claim, the subject provision is an adequate substitute for class arbitration as to this prong of *Discover*

27  *Bank*.

28

1              c.    *Allegations that ATTM Deliberately Cheated Large Numbers of Consumers out*
                    *of Individually Small Sums of Money*

2

3         While the second prong of *Discover Bank* addresses the class action function of providing

4 *recovery* to individuals with disputes involving small amounts of damages, the third prong addresses

5 the "role of the class action in *deterring* . . . wrongdoing." *Discover Bank*, 36 Cal. 4th at 156 (emphasis

6 added).  Instead of focusing on the ability of a proposed alternative mechanism to provide relief to

7 aggrieved consumers, this prong speaks to the concern that eliminating class actions "would permit the

8 defendant to retain the benefits of its wrongful conduct and to continue that conduct with impunity."

9 *Id.*  Accordingly, under this prong, the Court addresses whether – given the allegations in this case –

10 the elimination of a class action remedy in exchange for ATTM's proposed dispute resolution

11 mechanism would undermine this stated public policy and vitiate the "therapeutic effect" of class

12 actions in "halting" fraudulent conduct.  *Id.* at 156-61.

13        In its November 30, 3005 Order, the Court held that this prong was met because Plaintiffs

14 alleged that ATTM was engaged in a scheme to illegally charge a relatively small amount of money for

15 a phone it advertised as "free."  (Order, Nov. 30, 2005 at 12).  The allegations in this respect have not

16 changed, but as discussed in some detail above, the arbitration provision has dramatically changed.

17 Nevertheless, Plaintiffs argue that "[e]ven if [individual] potential plaintiffs would be willing to fight

18 to protect their rights [over small damage claims], many claims still will go unremedied in the absence

19 of a class action because, especially *as to deceptive practices* directed toward unwary consumers,

20 '*[m]any plaintiffs may not know their rights are being violated.*'"  (Oppo. at 21) (citation omitted)

21 (emphasis added).  According to Plaintiffs, prohibiting class litigation and requiring individual actions

22 would leave many consumers "like the class members Plaintiffs represent with no recovery at all for

23 violations of their rights, even if there would be attorneys willing to take their cases.  Only the class

24 procedures heralded in California courts – and their provisions for *notifying* potential class members

25 – can address these problems."  (*Id.* at 21) (emphasis added).

26        ATTM did not respond to this argument in its reply brief.  However, in its moving papers,

27 ATTM argued, but provided no evidence, that the Premium-based incentive is "likely to facilitate the

28 development of a market for fair settlement" of consumer claims.  (Motion to Compel at 15, citing

1  Nagareda Decl. ¶11). It is unclear how this "market" would be created, whether such a market presently

2  exists, and how such a market would apprise consumers of alleged wrongdoing. Presumably, if a

3  market for fair settlement exists, it may provide an adequate substitute for class litigation as those who

4  are harmed by, but unaware of, wrongdoing apparently would be provided notice and have an

5  opportunity to redress such wrongdoing through ATTM's informal claims and arbitration process. In

6  this way, such a market theoretically would have a deterrent effect on alleged corporate wrongdoing.

7       While ATTM notes that the revised arbitration provision has been in place for approximately

8  70 million customers for over 15 months, it does not point to any claims (Notices of Dispute or

9  Demands for Arbitration) for deceptive advertising. In addition, ATTM's informal resolution of

10  disputes during 2007 for $1.3 billion appears to involve "billing problems," and not claims for

11  deceptive advertising or other alleged wrongdoing by ATTM. (*See* Berinhout Decl. ¶¶ 15-16.) Further,

12  of the 570 people who have pursued arbitration against ATTM (either through the filing of a Notice of

13  Dispute or Demand for Arbitration), ATTM has failed to identify the nature or amount of these claims.

14  Without such evidence, the Court is unable to determine (a) whether a market for settlement exists; (b)

15  if so, whether the market created by the arbitration provision is an adequate substitute for class

16  arbitration *vis-a-vis* putative members of a class who are (absent notice) unaware of the violations

17  alleged in the present litigation; and (c) whether such a market would adequately deter ATTM's alleged

18  wrongdoing.

19       ATTM may complain that it has received few claims, or perhaps no claims, for deceptive

20  advertising because no such wrongdoing occurred, and that the alleged wrongdoing is manufactured

21  by Plaintiffs' lawyers to create a putative class action. That may be true; or Plaintiffs' claim may be

22  true (that the alleged wrongdoing exists but few consumers are aware of it). Regardless, at this stage

23  of the proceedings, Plaintiffs have stated a claim (as discussed *infra* at § II, B) and the Court's inquiry

24  necessarily is focused on whether the arbitration provision is an adequate substitute for the deterrent

25  effect of the class action mechanism. Plaintiffs argue that if the arbitration provision is enforced,

26  ATTM will simply pay the Concepcions what they are owed to avoid risking payment of the Premium,

27  and thereby also avoid potential liability to thousands of other customers who have no knowledge of

28

1   the alleged wrongdoing.  ATTM, Plaintiffs say, will therefore have no incentive to stop its wrongdoing.[9]

2       Faithful adherence to California's stated policy of favoring class litigation and arbitration to

3   deter alleged fraudulent conduct in cases involving large numbers of consumers with small amounts

4   of damages, compels the Court to invalidate ATTM's class waiver provision.  A class waiver provision

5   may "serve[] as a disincentive for [a party with superior bargaining power] to avoid the type of conduct

6   that might lead to class action litigation in the first place." *Discover Bank*, 36 Cal.4th at 159 (quoting

7   *Szetela,* 97 Cal. App. 4th at 1101).  "By imposing [a class waiver] clause on its customers, [a party with

8   superior bargaining power] has essentially granted itself a license to push the boundaries of good

9   business practices to their furthest limits . . . ."  *Id.*  This overarching policy concern of deterring

10  corporate wrongdoing is not sufficiently addressed by ATTM's revised arbitration provision.

11      In balancing the relative procedural and substantive unconscionability of the revised arbitration

12  provision, Plaintiffs have met their burden of establishing that the provision is unconscionable as

13  applied to them under California law.[10]  ATTM's motion to compel arbitration is denied.[11]

14  **B.    Motion to Dismiss**

15      **1.    Legal Standard**

16      Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it

17  fails to state a claim upon which relief can be granted.  The question presented by a motion to dismiss

18  is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer

---

20  [9]  While the revised arbitration provision permits punitive damages claims, which could be
21  used by an individual claimant in arbitration to deter alleged corporate wrongdoing, the United States
    Supreme Court has effectively limited punitive damages awards to ten times compensatory damages,
22  making the maximum possible damage award $75,000.  *See State Farm Mut. Auto. Ins. Co. v.
    Campbell*, 538 U.S. 408, 425 (2003) ("[F]ew awards exceeding a single-digit ratio between punitive
23  and compensatory damages, to a significant degree, will satisfy due process.")  One, or even several,
    such damage awards would be an insufficient substitute for the deterrent effect caused by the threat
24  of large damage awards that frequently accompany class action lawsuits.

25      [10]  Although the Concepcions arguably would be better off to individually pursue their claim
    in arbitration (as their net recovery may be larger and more quickly paid through ATTM's informal
26  claims and arbitration process), they have demonstrated by this litigation their desire to forego their
    individual rights under the arbitration provision in order to pursue relief on behalf of a larger group
27  of consumers.

28      [11]  For the reasons set forth in the Court's November 30, 2005 Order, the Court declines to
    conclude that the FAA preempts any holding that ATTM's arbitration provision is unenforceable under
    California law.

1   evidence in support of the claim. Fed. R. Civ. P. 12(b)(6).  *See Scheuer v. Rhodes*, 416 U.S. 232, 236

2   (1974), *overruled on other grounds* by *Davis v. Scherer*, 468 U.S. 183 (1984).  In answering this

3   question, the Court must assume that the plaintiff's allegations are true and must draw all reasonable

4   inferences in plaintiff's favor.  *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).

5   Even if the face of the pleadings suggests that the chance of recovery is remote, the Court must allow

6   the plaintiff to develop the case at this stage of the proceedings.  *See United States v. City of*

7   *Redwood City*, 640 F.2d 963, 966 (9th Cir. 1981).

8       Defendants seek dismissal of Plaintiffs' SAC on four grounds: (1) Plaintiffs lack standing to

9   bring their claims under California's UCL and FAL because they fail to adequately plead actual reliance

10  and injury in fact; (2) Plaintiffs cannot allege false or deceptive advertising as a matter of law because

11  California law permits the sales tax disclosure complained about by Plaintiffs; (3) Plaintiffs' claim fails

12  because the "chain of causation" was broken when the sales tax was disclosed on the sales receipt; and

13  (4) Plaintiffs' claim for restitution under the CLRA should be dismissed because, as this Court has

14  previously ruled, their failure to provide statutory notice permits them to receive only injunctive relief.

15  These arguments are addressed in turn.

16      **2.    Standing**

17      Section 17200 of the California Business and Professions Code defines "unfair competition"

18  as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or

19  misleading advertising and any act prohibited by [the FAL]." Cal. Bus. & Prof. § 17200.  By defining

20  unfair competition to include any "unlawful . . . business act or practice," the UCL permits violations

21  of other laws to be treated as unfair competition that are independently actionable.  *Cel-Tech*

22  *Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 180 (Cal. 1999).  As

23  such, any violation of the FAL necessarily violates the UCL.  *Committee on Children's Television, Inc.*

24  *v. General Foods Corp.*, 35 Cal.3d 197, 210 (Cal. 1983).

25      The FAL, which is codified at Section 17500, provides: "It is unlawful for any person . . .

26  corporation or association, or any employee thereof . . . to disseminate or cause to be so made or

27  disseminated [,] any such statement as part of a plan or scheme with the intent not to sell that personal

28  property or those services, professional or otherwise, so advertised at the price stated therein, or as so

1   advertised." Cal. Bus. & Prof. § 17500.  California courts have noted that the FAL prohibits "not only

2   advertising which is false, but also advertising which [,] although true, is either actually misleading or

3   which has a capacity, likelihood or tendency to deceive or confuse the public." *Leoni v. State Bar*, 39

4   Cal.3d 609, 626 (Cal. 1985).

5        Proposition 64, which was approved by California voters on November 2, 2004, amended

6   certain provisions of the UCL and FAL.  Before Proposition 64 passed, an uninjured private party could

7   bring a UCL (or FAL) action on behalf of the "general public," and could obtain remedies on behalf

8   of non-parties.  Proposition 64 amended Section 17204 of the UCL, as follows: "Actions for any relief

9   pursuant to this chapter shall be prosecuted exclusively . . . by any person who has suffered injury in fact

10  and has lost money or property as a result of such unfair competition." Cal. Bus. & Prof. Code § 17204.

11  Section 17203, which was also amended by Proposition 64, now provides, with respect to representative

12  private plaintiffs: "Any person may pursue representative claims or relief on behalf of others only if the

13  claimant meets the standing requirements of Section 17204 and complies with Section 382 of the Code

14  of Civil Procedure . . . . " Cal. Bus. & Prof. Code § 17203.  Accordingly, after Proposition 64, a person

15  seeking to represent claims on behalf of others must show that (1) he or she has suffered an injury in

16  fact, and (2) such injury occurred as a result of the defendant's alleged unfair competition or false

17  advertising.

18        In the November 30, 2005 Order, the Court found that the first prong – injury in fact – was

19  properly alleged.  With respect to the second prong, the Court found Plaintiffs had not adequately

20  alleged causation.  Plaintiffs' SAC now includes detailed allegations regarding each Plaintiff's reliance

21  on the advertisements to enter the store and purchase the cellular phones.  These allegations are

22  sufficient.

23        **3.    Safe Harbor**

24        Defendants next argue California law permits the sales tax and level of disclosure that Plaintiffs

25  contend is actionable.  In particular, 18 C.C.R. § 1585(b)(3) *requires* "retailers of . . . wireless

26  communication device[s]" to "report and pay tax measured by the unbundled [full retail] sales price of

27  the device and may collect tax or tax reimbursement from its customer measured by the unbundled sales

28  price."  Moreover, California Civil Code § 1656.1(a) permits retailers to disclose the sales tax to be

1   collected in the sales contract, sales receipt, or in its advertising.  Since Plaintiffs admit the sales tax

2   was disclosed in the sales receipt, Defendants argue Plaintiffs cannot state a claim for Defendants'

3   failure to disclose the tax in their advertising.  *See Cal-Tech Communications, Inc. v. Los Angeles*

4   *Cellular Telephone Co.,* 20 Cal. 4th 163, 183 (1999) ("[a]cts that the Legislature has determined to be

5   lawful may not form the basis for an action under the unfair competition law.")

6         Although wireless communication retailers are required to pay sales tax on the full retail value,

7   may pass that tax onto consumers, and do not have to advertise the tax, no California law sets forth the

8   disclosure required when the sales tax passed onto the consumer is calculated based upon a price *other*

9   *than the advertised price.*  At this stage of the proceedings, the Court declines to dismiss the action.

10        **4.   Causal Chain**

11        Defendants note the SAC alleges that by the time Plaintiffs had completed the transaction, the

12  sales receipt made them aware of the tax and they easily could have stopped the transaction and avoided

13  injury.  According to Defendants, the "causal chain is broken by Plaintiffs' acknowledgment that [the]

14  sales tax was listed on the sales receipts." (Def. Supp. at 6).  A completed sale, however, is not the only

15  injury Plaintiffs allege.[12]  Plaintiffs allege they were induced to "shop for and consider signing a service

16  contract."  (SAC ¶ 21).  Damages allegedly arising out of events occurring before the sale took place

17  also can be linked to the advertising.  Accordingly, the Court declines to find that all damages have

18  been foreclosed because the tax appeared on the sales receipt.

19        **5.   Restitution**

20        Defendants also seek dismissal of Plaintiffs' claim for restitution under the CLRA because they

21  failed to give proper notice to Defendants of their CLRA claim, as required by California Civil Code

22  § 1782.  Section 1782(a) provides:

23        Thirty days or more prior to the commencement of an action for damages pursuant to
          this title, the consumer shall do the following:

24

25        (1)  Notify the person alleged to have employed or committed methods, acts, or
          practices declared unlawful by Section 1770 of the particular alleged violations

26  _____

27        [12]  The Court declines to address whether a "chain of causation" is broken as to damages
      allegedly occurring during or after the sale, since the SAC adequately alleges damages arising out of
28    events that took place before the sale.  In addition, it is unclear whether Plaintiffs received a sales
      receipt before or after signing a service contract, and whether there was an opportunity to avoid paying
      the sales tax after it was disclosed.

1  of Section 1770.

2      (2)  Demand that the person correct, repair, replace, or otherwise rectify the
   goods or services alleged to be in violation of Section 1770.
3

   The notice shall be in writing and shall be sent by certified or registered mail, return
4  receipt requested, to the place where the transaction occurred or to the person's principal
   place of business within California.
5

6  Cal. Civ. Code § 1782(a). While litigating the motion to dismiss the FAC, Plaintiffs conceded they failed

7  to comply with the thirty day notice requirement set forth in § 1782.  (*See* Order, Nov. 30, 2005 at 17).

8  On those grounds, the Court dismissed the damages claims with prejudice pursuant to *Outboard Marine*

9  *Corp. v. Superior Court*, 52 Cal.App.3d 30, 40-41 (1975) ("The purpose of the notice requirement of

10 section 1782 is to give the manufacturer or vendor sufficient notice of alleged defects to permit

11 appropriate corrections or replacements . . . .  This clear purpose may only be accomplished by a literal

12 application of the notice provisions.").  However, the claim for injunctive relief was not dismissed

13 because Section 1782(d) authorizes the filing of an action for injunctive relief without first providing

14 notice to the vendor.  (Order at 18).

15     Plaintiffs now claim that restitution, like injunctive relief, is not subject to the notice

16 requirement.  California Civil Code § 1782(d) provides that an "action for injunctive relief . . . may be

17 commenced without compliance with subdivision (a)."  Section 1782(a) specifies that the notice

18 requirement applies to an "action for damages."  Plaintiff argues the notice requirement should be

19 interpreted to encompass only claims for "actual damages," while Defendant argues it should

20 encompass claims for all types of monetary damages, including restitution.

21     Section 1780, which list the available remedies for violations of the section, includes "actual

22 damages," injunctive relief, and restitution of property.  To interpret Section 1782's notice requirement

23 for "damages" to be limited to "actual damages" would render the word "actual" in Section 1780

24 redundant.  In addition, if the Legislature intended Section 1782's reference to "damages" to include

25 *only* "actual damages," it is unclear why it would specifically exempt *only* injunctive relief from the

26 notice requirement in Section 1782(d).  Accordingly, the Court finds that the notice requirement applies

27 to monetary damages, regardless of whether such damages are calculated based upon the unjust

28 enrichment of Defendant or the Plaintiffs' loss.  Plaintiffs' restitution claim under CLRA is therefore

1    dismissed with prejudice.

2                                          **III.**

3                              **CONCLUSION AND ORDER**

4          For these reasons, ATTM's motion to compel the Concepcion Plaintiffs to arbitration is denied;

5    Defendants' motion to dismiss Plaintiffs' claims under the UCL and FAL is denied; and Defendants'

6    motion to dismiss Plaintiffs' claims for restitution under the CLRA is granted with prejudice.

7          **IT IS SO ORDERED.**

8

9    DATED:  August 11, 2008

10   _____

11                              HON. DANA M. SABRAW
                                United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28