HULETT HARPER STEWART LLP
KIRK B. HULETT, SBN: 110726
DENNIS STEWART, SBN: 99152
SARAH PICKERAL WEBER, SBN: 239979
525 B Street, Suite 760
San Diego, CA 92101
Telephone:     (619) 338-1133
Facsimile:      (619) 338-1139

NICHOLAS & BUTLER, LLP
CRAIG M. NICHOLAS, SBN: 178444
MATTHEW B. BUTLER, SBN: 201781
ALEX M. TOMASEVIC, SBN: 245598
225 Broadway, 19th Floor
San Diego, CA 92101
Telephone:     (619) 325-0492
Facsimile:      (619) 325-0496

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER L. LASTER, et al.<br><br>Plaintiffs,<br><br>v.<br><br>T-MOBILE USA, INC., et al.,<br><br>Defendants. | CASE NO. 05CV1167DMS (AJB)<br><br>**PLAINTIFF JENNIFER LASTER'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO T-MOBILE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>DATE:          August 28, 2009<br>TIME:          1:30 p.m.<br>JUDGE:        Honorable Dana M. Sabraw<br>CTRM:        10 |

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................................1

II.    STATEMENT OF FACTS .......................................................................................2

       A.     T-Mobile's Unfair Business Practices ........................................................2

       B.     Ms. Laster's Purchase ................................................................................3

III.   MS. LASTER'S CLAIMS .......................................................................................4

       A.     The UCL and False Advertising Claims ....................................................4

              1.     "Fraudulent" Business Practices and Advertising ......................4

              2.     "Unlawful" Business Practices and Advertising.........................5

              3.     "Unfair" Business Practices and Advertising ............................7

       B.     The CLRA Claim .......................................................................................7

IV.    SUMMARY JUDGMENT STANDARD.............................................................8

V.     T-MOBILE'S MOTION MUST BE DENIED IN FULL.................................9

       A.     Ms. Laster Relied on T-Mobile Ads That Were Likely to Deceive and T-Mobile Cannot Establish, as a Matter of Law, That Any Purported Web Disclaimers Were Relevant to the Transaction........................................9

       B.     Ms. Laster Will Be Able to Rebut Any Presumption That She Agreed to Pay Any Money, Whether Labeled a Sales Tax or Otherwise, for Her "Free" Phone .............................................................................................10

       C.     Ms. Laster Has Standing to Pursue Her Claims....................................12

              1.     Ms. Laster Has Standing Under Article III ...............................12

              2.     Ms. Laster Has Standing Under the UCL and FAL ..................13

       D.     T-Mobile's Motion Must Be Denied or Continued Under Federal Rule of Civil Procedure 56(f) Because Ms. Laster Was Precluded from Taking Discovery on the Merits of Her Case.......................................................18

VI.    CONCLUSION .......................................................................................................21

i

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Table of Authorities

**Page(s)**

CASES

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ........................................................................................................... 8

*Bank of the W. v. Superior Court*,
  2 Cal. 4th 1254 (1992) ....................................................................................................... 5

*Bliss v. Franco*,
  446 F.3d 1036 (10th Cir. 2006) ....................................................................................... 18

*Brown v. Bank of Am., N.A.*,
  457 F. Supp. 2d 82 (D. Mass. 2006) ........................................................................... 17, 18

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ......................................................................................................... 18

*Clark v. Coats & Clark, Inc.*,
  929 F.2d 604 (11th Cir. 1991) ........................................................................................... 8

*Cortez v. Purolator Air Filtration Prods. Co.*,
  23 Cal. 4th 163 (2000) ....................................................................................................... 7

*Donovan v. RRL Corp.*,
  26 Cal. 4th 261 (2001) ..................................................................................................... 17

*Eastman Kodak Co. v. Image Technical Servs., Inc.*,
  504 U.S. 451 (1992) ..................................................................................................... 8, 20

*Feather River Trailer Sales, Inc. v. Sillas*,
  96 Cal. App. 3d 234 (1979) ............................................................................................... 4

*Fontenot v. Upjohn Co.*,
  780 F.2d 1190 (5th Cir. 1986) ........................................................................................... 8

*Heighley v. J.C. Penney Life Ins. Co.*,
  257 F. Supp. 2d 1241 (C.D. Cal. 2003) ............................................................................. 5

*Hibernia Bank v. State Bd. of Equalization*,
  166 Cal. App. 3d 393 (1985) ........................................................................................... 11

*In re GMC Dex-Cool Prods. Liab. Litig.*,
  241 F.R.D. 305 (S.D. Ill. 2007) ....................................................................................... 15

*In re Tobacco II Case*,
  46 Cal. 4th 298 (2009) ("*Tobacco II*") ..................................................................... *passim*

ii

*In re Tobacco II Cases,*
    142 Cal. App. 4th 891 (2006)................................................................. 17

*International Raw Materials, Ltd. v. Stauffer Chem. Co.,*
    898 F.2d 946 (3d Cir. 1990)............................................................. 18, 21

*Kagan v. Gibraltar Sav. & Loan Ass'n,*
    35 Cal. 3d 582 (1984) ........................................................................ 7

*Kasky v. Nike, Inc.,*
    27 Cal. 4th 939 (2002) ....................................................................... 4

*Kohen v. Pacific Inv. Mgmt. Co. LLC,*
    571 F.3d 672, 2009 WL 1919013 (7th Cir. 2009) ............................... 15

*Lavie v. Procter & Gamble Co.,*
    105 Cal. App. 4th 496 (2003)............................................................. 4

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)......................................................................... 13

*Mass. Mut. Life Ins. Co. v. Superior Court,*
    97 Cal. App. 4th 1282 (2002)........................................................... 17

*McKell v. Washington Mut., Inc.,*
    142 Cal. App. 4th 1457 (2006).......................................................... 5

*Munson v. Del Taco, Inc.,*
    46 Cal. 4th 661 (2009) .................................................................... 6, 9

*Nationwide Life Ins. Co. v. Bankers Leasing Ass'n,*
    182 F.3d 157 (2d Cir. 1999)............................................................... 8

*Negrete v. Allianz Life Ins. Co.,*
    238 F.R.D. 482 (C.D. Cal. 2006) ...................................................... 17

*Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.,*
    210 F.3d 1099 (9th Cir. 2000)............................................................ 8

*People v. Casa Blanca Convalescent Homes, Inc.,*
    159 Cal. App. 3d 509 (1984).............................................................. 7

*S. Cal. Gas Co. v. City of Santa Ana,*
    336 F.3d 885 (9th Cir. 2003).............................................................. 8

*Saunders v. Superior Court,*
    27 Cal. App. 4th 832 (1994).............................................................. 5

*Schnall v. Hertz Corp.,*
    78 Cal. App. 4th 1144 (2000)............................................................. 5

iii

*Smith v. Block,*
    784 F.2d 993 (9th Cir. 1986)........................................................................................... 13

*State Farm Fire & Cas. Co. v. Superior Court,*
    45 Cal. App. 4th 1093 (1996)........................................................................................... 7

*T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,*
    809 F.2d 626 (9th Cir. 1987)........................................................................................... 8

*Vasquez v. Superior Court,*
    4 Cal. 3d 800 (1971) ............................................................................................... 7, 17

*Waldridge v. American Hoechst Corp.,*
    24 F.3d 918 (7th Cir. 1994)............................................................................................. 8

*Williams v. Gerber Prods. Co.,*
    523 F.3d 934 (9th Cir. 2008)........................................................................................... 5

## STATUTES, RULES & REGULATIONS

Code of Federal Regulations
    16 C.F.R. § 238.2 ............................................................................................................ 7
    16 C.F.R. § 251.1 ............................................................................................................ 6
    16 C.F.R. § 251.1(b) .................................................................................................... 1, 2
    16 C.F.R. § 251.1(c)................................................................................................ *passim*

Federal Rules of Civil Procedure
    Rule 23 ..................................................................................................................... 15, 17
    Rule 26(f) ...................................................................................................................... 19
    Rule 56(c) ........................................................................................................................ 8
    Rule 56(f) ................................................................................................................. 18, 21

California Business & Professions Code
    § 17200.................................................................................................................. 2, 4, 5
    § 17204........................................................................................................................ 14
    § 17500................................................................................................................... 2, 44

California Civil Code
    § 1651.6....................................................................................................................... 10
    § 1656.1....................................................................................................................... 11
    § 1656.1(a) ............................................................................................................. 10, 12
    § 1656.1(d) .................................................................................................................. 11
    § 1750........................................................................................................................... 2
    § 1770(a) ....................................................................................................................... 7
    § 1770(a)(9)................................................................................................................... 7
    § 1770(a)(13)................................................................................................................. 7

iv

# I.     **INTRODUCTION**

Use of the word "free" is a common tactic used by retailers to lure customers into their stores, for all types of consumer products.  Mobile phone service providers, like Defendant T-Mobile,[1] are no different.  It is difficult to imagine a single consumer who has not heard T-Mobile's simple, yet consistent marketing message: *if you sign up for a long-term contract, you will get a "free" phone.*

While T-Mobile advertises "free" phones, it actually charges significant amounts for them. T-Mobile hides this unlawful practice by dubbing the charge a "tax," or in Plaintiff Jennifer Laster's case, a $28.22 fee described nebulously on her receipt as "San Diego, CA, San Diego." This "tax," furthermore, is not calculated on the actual price of the phone, but rather, on a full retail value of the phone.  In doing so, T-Mobile violates clear Federal Trade Commission ("FTC") regulations that dictate when and how a retailer can use the word "free" in its marketing campaigns.  *See, e.g.,* 16 C.F.R. § 251.1(b) ("'Free' indicates that the consumer is paying nothing for that article . . . ."); 16 C.F.R. § 251.1(c) (all contingencies must be set out "clearly and conspicuously at the outset of the offer so as to leave no reasonable probability that the terms of the offer might be misunderstood").

Nothing in T-Mobile's motion for summary judgment requires dismissal of Ms. Laster's simple and provable claims.  Ms. Laster declared under penalty of perjury and reiterated in her deposition that she saw and relied on T-Mobile advertisements that promised her a "free" phone and that she thought "free" meant what it is supposed to mean: that she would pay nothing for her phone.  Those advertisements were a substantial factor in Ms. Laster's decision to purchase her phone and service.

After she arrived at the store, however, T-Mobile charged Ms. Laster $28.22 for the "free" phone.  Ms. Laster assumed the charge was related to her new phone service commitment and did not learn she was defrauded until after the transaction was complete and she had left the store. Ms. Laster seeks restitution and an injunction on behalf of herself and a class of similarly-situated

---

[1]  T-Mobile refers collectively to Defendants T-Mobile USA, Inc., Omnipoint Communications, Inc., and TMO CA/NV, LLC.

1  California consumers under the California Unfair Competition Law, Cal. Bus. & Prof. Code

2  §§ 17200, *et seq.* ("UCL"), California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et*

3  *seq.* ("FAL") and the California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.*

4  ("CLRA").   T-Mobile's motion for summary judgment must be denied in full.   T-Mobile

5  misconstrues the nature of the legal claims and does not accurately describe Ms. Laster's

6  deposition testimony that underpins the motion.

7  **II.    STATEMENT OF FACTS**

8     **A.    T-Mobile's Unfair Business Practices**

9     T-Mobile markets and sells mobile phones and service plans to 32.8 million customers

10  throughout the United States.  Declaration of Alex M. Tomasevic ("Tomasevic Decl."), ¶ 15,

11  Ex. H (T-Mobile Press Release).   T-Mobile sells the vast majority of its phones and services

12  together in a "bundled" transaction.  In exchange for agreeing to a wireless service contract for a

13  term of one or more years, T-Mobile offers its customers cell phones for free or at deeply

14  discounted prices.  Defendants' Memo. of Points and Authorities in Support of Motion to Dismiss

15  SAC at 2 (Docket No. 79).  In fact, T-Mobile continues this practice today.   Tomasevic Decl.,

16  ¶¶ 6-9, Exs. D-G (printed web offers); Declaration of Matthew B. Butler ("Butler Decl."), Ex. A.[2]

17     In order to lure customers to purchase its lucrative service, T-Mobile heavily advertises

18  these "free" and deeply discounted cell phones.  Its advertisements throughout the class period

19  offer phones as "Buy One, Get One Free," "All phones Free," "$49 Out the Door," "Free Out the

20  Door," "$0 Out the Door," and the like.  *See* Tomasevic Decl., ¶¶ 6-9, Exs. D-G (printed web

21  offers); Butler Decl., Ex. A; Second Amended Complaint ("SAC"), ¶ 27.   T-Mobile's

22  advertisements violate the FTC's regulations regarding use of the word "free" in advertisements.

23  SAC, ¶¶ 52-53; *Compare* Tomasevic Decl., ¶¶ 6-9, Exs. D-G, and Butler Decl., Ex. A, *with* 16

24  C.F.R. § 251.1(b); 16 C.F.R. § 251.1(c).

25     Even when the sales tax is disclosed, the type-size, font, and location of the disclosure is

26  such that consumers are likely to be misled to believe they will receive the phone for free or for

27

28  [2]  Exhibit "G" to the Alex Tomasevic Declaration refers collectively to what has been broken out as Exhibits G1 through G4.

the stated, deeply discounted price (plus sales tax on the discounted price).  *Id.*  These advertisements failed to adequately disclose to Ms. Laster the critical information that she would be required to reimburse T-Mobile for sales taxes and based on the undisclosed retail price of the purported "free" and deeply discounted phones.  SAC ¶ 38; *see* Tomasevic Decl., ¶¶ 6-9, Exs. D-G; Laster Depo. at 34:1-19; Laster Decl., ¶¶ 3, 6; Butler Decl., Ex. A.

**B.      Ms. Laster's Purchase**

In early 2005, Ms. Laster decided to purchase a mobile phone and phone service. Declaration of Plaintiff Jennifer Laster ("Laster Decl."), ¶ 3.  Ms. Laster was interested most in getting her phone for free and was not overly concerned with matters such as coverage area or phone features.   Laster Decl., ¶ 3; Laster Depo. at 34:1-19, 35:4-6, 81:1-7, 82:21-83:1[3] (an "important factor" for Ms. Laster was "to pay as little as possible for the phone itself").

Ms. Laster previously saw numerous T-Mobile television and newspaper ads for T-Mobile phones and service.  Laster Decl., ¶ 3; Laster Depo. at 47:25-48:14.  Ms. Laster also saw T-Mobile ads on posters near T-Mobile stores.  Laster Decl., ¶ 3; Laster Depo. at 47:25-48:14.  Many of these ads advertised supposedly "free" phones with activation of a long-term service contract. Laster Decl., ¶¶ 3.  T-Mobile's ads were pervasive and Ms. Laster saw these ads "everywhere." Laster Depo. at 47:2-48:4.  This "free phone" ad campaign on television and in print was a substantial factor in Ms. Laster's decision to sign up for a phone and for service with T-Mobile. Laster Decl., ¶¶ 3-4; Laster Depo. at 47:25- 48:4, 82:21-83:1.  In short, Ms. Laster entered into her transaction with T-Mobile believing that she would have to pay nothing for her phone, tax included.  Laster Decl., ¶¶ 3-4; Laster Depo. at 34:1-8, 47:25-48:4, 82:21-83:1.

With T-Mobile's "free phone" campaign in mind, Ms. Laster then visited T-Mobile's website to compare the various phones offered.  Laster Depo. at 34:1-19, 46:3-6.  Ms. Laster then focused on a "free" Sharp mobile phone.  Laster Depo. at 30:8-12, 33:4-14, 34:1-19.  Relying on the T-Mobile television, newspaper, and web ads promising "free" phones, Ms. Laster then went to a San Diego T-Mobile store in hopes of purchasing service, and getting a free phone.  Laster

_____

[3]   The deposition excerpts cited herein are attached as Exhibit A to the Tomasovic Decl., filed concurrently herewith.

Decl., ¶¶ 3-4; Laster Depo. at 30:8-12, 31:15-20, 47:12-49:2.

At the end of her transaction, Ms. Laster paid $28.22.  She was not aware at the time that T-Mobile charged her $28.22 as a measure of sales tax, let alone sales tax calculated on the full retail price of the phone.  Laster Depo. at 41:11-19, 42:23-43:3, 52:12-15.  Ms. Laster assumed, at the time, that she was paying for service.  Laster Depo. at 40:25-41:1, 41:11-19, 52:12-15  ("Q. And you knew you thought that was a good price for the phone and the service?  A.  For the service.  The phone was supposed to be free."); Laster Depo. at 83:11-18.  Ms. Laster's receipts did not state that $28.22 was for purported state taxes.  Tomasevic Decl., Exs. B & C; Laster Depo. at 66:5-15.

After learning that T-Mobile charged Ms. Laster $28.22 as a purported sales tax on her "free" phone, Ms. Laster filed her Complaint.  Ms. Laster seeks to represent a class of similarly-situated plaintiffs who also paid money for phones advertised as "free."  Laster Depo. at 112:15-25.

## III.   MS. LASTER'S CLAIMS

### A.   The UCL and False Advertising Claims

Under the UCL there are three varieties of unfair competition, as "unfair competition" means any fraudulent, unlawful, or unfair business act or practice and any "unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200; *In re Tobacco II Case*, 46 Cal. 4th 298, 311 (2009) ("*Tobacco II*").  Here, Ms. Laster alleges all three: that T-Mobile's acts were fraudulent, unlawful, and unfair.

Similarly, Business & Professions Code section 17500 specifically forbids deceptive or false advertising in connection with the disposition of real or personal property, or services.  Section 17500 prohibits negligent as well as intentional dissemination of misleading advertising.  *Feather River Trailer Sales, Inc. v. Sillas*, 96 Cal. App. 3d 234, 247 (1979).  Sections 17500 and 17200 are interrelated in that "'[a]ny violation of the false advertising law . . . necessarily violates' the UCL" and vice-versa.  *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 950 (2002) (citation omitted); Cal. Bus. & Prof. Code § 17200; *Tobacco II*, 46 Cal. 4th at 312, n.8.

#### 1.   "Fraudulent" Business Practices and Advertising

To succeed in their claim under the "fraudulent" prong of the UCL, plaintiffs "'need only show that "members of the public are likely to be deceived."'"  *Lavie v. Procter & Gamble Co.*,

4

105 Cal. App. 4th 496 (2003) (citation omitted); *Bank of the W. v. Superior Court*, 2 Cal. 4th 1254, 1266-67 (1992); *Williams v. Gerber Prods. Co.*, 523 F.3d 934, 939-40 (9th Cir. 2008).   Unlike common law fraud, Plaintiff need not prove that every Class member "'was actually deceived . . . .'"  *Heighley v. J.C. Penney Life Ins. Co.*, 257 F. Supp. 2d 1241, 1259 (C.D. Cal. 2003) (citation omitted); *Schnall v. Hertz Corp.*, 78 Cal. App. 4th 1144, 1167 (2000).  In short:

> The fraudulent business practice prong of the UCL has been understood to be distinct from common law fraud.  "A [common law] fraudulent deception must be actually false, known to be false by the perpetrator and reasonably relied upon by a victim who incurs damages. None of these elements are required to state a claim for injunctive relief" under the UCL.  This distinction reflects the UCL's focus on the defendant's conduct, rather than the plaintiff's damages, in service of the statute's larger purpose of protecting the general public against unscrupulous business practices.

*Tobacco II*, 46 Cal. 4th at 312 (citation omitted).

The UCL specifically extends to deceptive advertising in prohibiting "unfair, deceptive, untrue or misleading advertising."   Cal. Bus. & Prof. Code § 17200.   Advertising is broadly defined to include virtually any statement made in connection with the sale of goods or services, including statements and pictures on labels.  *Williams*, 523 F.3d at 939.  Advertising that is likely to deceive the reasonable consumer violates California law.  *Id.* at 938.  As this Court stated on August 11, 2008: "California courts have noted that the FAL prohibits 'not only advertising which is false, but also advertising which[,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'"  Aug. 11, 2008 Order at 22 [Docket No. 154] (quoting *Leoni v. State Bar*, 39 Cal. 3d 609, 626 (1985)).

### 2.   "Unlawful" Business Practices and Advertising

"Unlawful" business acts or practices within the meaning of the UCL "include anything that can properly be called a business practice and that at the same time is forbidden by law." *McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457, 1475 (2006) (citing *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999)) (internal quotations omitted).  The UCL therefore permits violations of other laws to be treated as unfair competition that is independently actionable.  *McKell*, 142 Cal. App. 4th at 1474-75.  A violation of the underlying law is a *per se* violation of the UCL.  *Saunders v. Superior Court*, 27 Cal. App. 4th 832

5

1    (1994).   The underlying, or predicate, law can come from either federal or state authorities.

2    *Munson v. Del Taco, Inc.*, 46 Cal. 4th 661, 676 (2009).

3            Here, both state and federal authorities provide the underlying law.   For instance, with

4    respect to the defendants' liberal use of the word "free," the Federal Trade Commission's

5    Regulations provide:

6            (a) General. . . .

7                    (2)   Because the purchasing public continually searches for the best buy,
                     and regards the offer of "Free" merchandise or service to be a special

8                    bargain, *all such offers must be made with extreme care so as to avoid any
                     possibility that consumers will be misled or deceived.* . . .

9            (b) Meaning of "Free."

10                   (1)   The public understands that . . . an offer of "Free" merchandise or
                     service is based upon a regular price for the merchandise or service which

11                   must be purchased by consumers in order to avail themselves of that which
                     is represented to be "Free."   In other words, when the purchaser is told that

12                   an article is "Free" to him if another article is purchased, *the word "Free"
                     indicates that he is paying nothing for that article and no more than the*

13                   *regular price for the other.*   Thus, a purchaser has a right to believe that the
                     merchant will not directly and immediately recover, in whole or in part, the

14                   cost of the free merchandise or service by marking up the price of the
                     article   which   must   be   purchased,   by   the   substitution   of   inferior

15                   merchandise or service, or otherwise.

16   16 C.F.R. § 251.1 (emphasis added).   Sub-paragraph (c) of this federal law dictates how

17   disclaimers and conditions on "free" offers must be published.   That sub-paragraph states:

18           (c) Disclosure of conditions.

19           When making "Free" or similar offers all the terms, conditions and obligations
             upon which receipt and retention of the "Free" item are contingent *should be set

20           forth clearly and conspicuously at the outset of the offer so as to leave no
             reasonable probability that the terms of the offer might be misunderstood.*   Stated

21           differently, *all of the terms, conditions and obligations should appear in close
             conjunction with the offer of "Free" merchandise or service.*   For example,

22           disclosure of the terms of the offer set forth in a footnote of an advertisement to
             which reference is made by an asterisk or other symbol placed next to the offer, is

23           not regarded as making disclosure at the outset.   However, mere notice of the
             existence of a "Free" offer on the main display panel of a label or package is not

24           precluded provided that (1) the notice does not constitute an offer or identify the
             item being offered "Free," (2) the notice informs the customer of the location,

25           elsewhere on the package or label, where the disclosures required by this section
             may be found, (3) no purchase or other such material affirmative act is required in

26           order to discover the terms and conditions of the offer, and (4) the notice and the
             offer are not otherwise deceptive.

27   *Id.* (emphasis added).

28

6

The FTC's Regulations also provide that:

> (a)  No statement or illustration should be used in any advertisement which creates a false impression of the grade, quality, make, value, currency of model, . . . or origin of the product offered, or which may otherwise misrepresent the product in such a manner that later, on disclosure of the true facts, the purchaser may be switched from the advertised product to another

> (b)  Even though the true facts are subsequently made known to the buyer, the law is violated if the first contact or interview is secured by deception.

16 C.F.R. § 238.2.  In short, Ms. Laster and her fellow customers had a statutory right to be told the truth in all advertising and marketing directed toward them.  T-Mobile invaded this right, and thereby committed an act of unfair competition, when it advertised one price for phones but charged the members of the class another.

### 3.     "Unfair" Business Practices and Advertising

The unfair "prong" of the UCL may be established by weighing "'the utility of the defendant's conduct against the gravity of the harm to the alleged victim.'"  *State Farm Fire & Cas. Co. v. Superior Court*, 45 Cal. App. 4th 1093, 1104 (1996) (citation omitted).  A business practice is unfair when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.  *People v. Casa Blanca Convalescent Homes, Inc.*, 159 Cal. App. 3d 509, 530 (1984).  False advertising, like that alleged by Plaintiff here, has no utility and never constitutes a justified business practice.  *Vasquez v. Superior Court*, 4 Cal. 3d 800, 808 (1971). Finally, the UCL imposes strict liability.  *Cortez v. Purolator Air Filtration Prods*. Co., 23 Cal. 4th 163, 181 (2000).

### B.     The CLRA Claim

A defendant is liable under the CLRA if it advertises goods or services with the intent not to sell them as advertised and if it makes false or misleading statements of fact concerning the existence of price reductions.  Cal. Civ. Code §§ 1770(a)(9) and (13).  The statute is violated "in a transaction intended to result or which results in the sale or lease of goods or services . . . ." Cal. Civ. Code § 1770(a).  One who bought the subject product is entitled to recovery if the defendant violated the CLRA.  *Kagan v. Gibraltar Sav. & Loan Ass'n*, 35 Cal. 3d 582, 593 (1984).

7

1   **IV.     SUMMARY JUDGMENT STANDARD**

2          Because summary judgment is a "drastic device," cutting off a party's right to present its

3   case to a jury, T-Mobile bears a "heavy burden" of demonstrating the absence of any triable issue

4   of material fact.  *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n*, 182 F.3d 157, 160 (2d Cir.

5   1999).  T-Mobile has both an initial burden of production and the ultimate burden to persuade this

6   Court that there is "no genuine issue as to any material fact and that [T-Mobile] is entitled to

7   judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Nissan Fire & Marine Ins. Co. v. Fritz Cos.,*

8   *Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  This requires T-Mobile to establish beyond controversy

9   every essential element of its claim or defense: "[I]f the movant bears the burden of proof on an

10  issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he

11  must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant

12  judgment in his favor."  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in

13  original); *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003).  It is not enough

14  for T-Mobile simply to state that the Ms. Laster "'cannot meet her burden at trial.'"  *Nissan Fire &*

15  *Marine Ins.*, 210 F.3d at 1105 (citation omitted); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608

16  (11th Cir. 1991).

17         Ms. Laster, in opposing T-Mobile's motion, "need not match [T-Mobile] witness for

18  witness, nor persuade the Court that her case is convincing, she need only come forward with

19  appropriate evidence demonstrating that there is a pending dispute of material fact."  *Waldridge v.*

20  *American Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).  The Court must view the evidence

21  presented on the motion in the light most favorable to Ms. Laster: "The evidence of the nonmovant

22  is to be believed, and all justifiable inferences are to be drawn in [her] favor."  *Anderson v. Liberty*

23  *Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The non-movant's version of any disputed issue of fact is

24  presumed correct.  *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992);

25  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987).

26

27

28

8

**V.    T-MOBILE'S MOTION MUST BE DENIED IN FULL**

      **A.    Ms. Laster Relied on T-Mobile Ads That Were Likely to Deceive and T-Mobile Cannot Establish, as a Matter of Law, That Any Purported Web Disclaimers Were Relevant to the Transaction**

Ms. Laster relied on a T-Mobile advertising campaign that promised her she would pay nothing for her phone.  Laster Decl., ¶¶ 3-4; Laster Depo. at 34:1-8, 47:25-48:4, 82:21-83:1.  At no point was Ms. Laster apprised of the fact that she would have to pay a purported "tax" on her phone, let alone an inflated one based on something other than the advertised price.  *Id.*  T-Mobile actually charged Ms. Laster $28.22 for her "free" phone.  Laster Depo. at 41:11-19, 42:23-43:3, 52:12-15.

Ms. Laster not only was "likely to be" deceived, but she actually was deceived by T-Mobile's behavior.  Laster Depo. at 52:12-15.  T-Mobile's acts, therefore, violated the relatively lax "fraudulent" prong of the UCL.  *Tobacco II*, 46 Cal. 4th at 312.  Because T-Mobile's advertisements did not follow FTC regulations regulating use of the word "free," those acts were also "unlawful." *See Munson v. Del Taco, Inc.*, 46 Cal. 4th 661, 676 (2009).

T-Mobile does not deny that it advertises phones for "free."  *Cf.* Tomasevic Decl., ¶¶ 6-9, Exs. D-G.  Rather, T-Mobile boldly (and wrongly) claims that Ms. Laster must have seen certain web disclaimers at the time of her purchase that, in turn, must have formed the basis of the agreement between her and T-Mobile.  T-Mobile Mem. at 3:3-19.  T-Mobile's attempts to disavow a pervasive and long-standing "free phone" marketing campaign, and to re-write the terms of its contract with Ms. Laster, must be rejected.

Ms. Laster does not recall ever seeing the purported disclaimers in the web pages T-Mobile is trying to force upon her.  Laster Depo. at 33:6-21, 36:9-15, 38:5-11, 40:12-16, 39:12-19, 43:1-15.  She is not "basing" her Complaint on those web pages.  *Cf.* T-Mobile Mem. at 8:4-11.  In fact, there are material differences between the web pages T-Mobile relies upon and the bargain as Ms. Laster understood it.   For example, the website references instant "rebates" whereas Ms. Laster does not recall mention of a rebate, only that the phone was supposedly "free."  Laster Depo. at 33:4-14.  Nor do any of Ms. Laster's receipts reference any rebate.  Tomasevic Decl, Exs. B, C.  In short, T-Mobile has not and cannot establish that, as a matter of law, Ms. Laster must have seen and contemplated certain unrecognized disclaimers on a website when she made

9

1    the decision to purchase.[4]

2    **B.      Ms. Laster Will Be Able to Rebut Any Presumption That She Agreed to Pay
         Any Money, Whether Labeled a Sales Tax or Otherwise, for Her "Free"
3        Phone**

4        T-Mobile next attempts to mischaracterize this case as more about state taxes than false

5    advertising.  While T-Mobile may disguise its hidden charges as a "sales tax," it does not matter

6    whether or not T-Mobile calls the improperly-disclosed fees a "tax," a "fee," a "surcharge," or

7    anything else.  Indeed, Ms. Laster did not know she was paying a "tax" at the time.  Laster Depo.

8    at 41:11-19, 42:23-43:3, 52:12-15.   As such, statutory presumptions regarding sales tax are

9    irrelevant.   To the extent those statutory provisions may be useful, T-Mobile fails to meet its

10   burden to show that there is no issue of fact regarding purported presumptions of agreed sales tax

11   reimbursement.   T-Mobile cannot conclusively show that it has met any of the requirements for

12   any such presumption to attach.

13       California Civil Code § 1651.6 dictates when it might be presumed that a consumer agreed

14   to pay the sales tax reimbursement.  That section states that a presumption may attach when (1) the

15   agreement for sale "expressly provides for such addition of sales tax reimbursement," (2) sales tax

16   reimbursement "is shown on the sales check or other proof of sale," or (3) the retailer posts in his

17   or her premises in a location visible to purchasers, or includes on a price tag or in an advertisement

18   or other printed material directed to purchasers, a notice to the effect that reimbursement for sales

19   tax will be added to the sales price.  Cal. Civ. Code § 1656.1(a).  Here, none of those three

20   circumstances have been conclusively shown as a matter of law.

21       T-Mobile again points to the web offer disclaimers in an attempt to establish the

22   presumption.  T-Mobile Mem. at 10:4-11 (citing "Ex. L6").  However, that web offer is irrelevant

23   because Ms. Laster never saw it, and therefore, never considered it as part of her transaction.

24   Laster Depo. at 33:6-21, 36:9-15, 38:5-11, 40:12-16, 39:12-19, 43:1-15.

25   _____

26   [4]  With respect to the web ad that T-Mobile relies on so heavily, T-Mobile erroneously attempts to
     use it as both a sword and a shield.  First, T-Mobile claims that the web page and its disclaimers
27   must have been part of the bargain with Ms. Laster and, therefore, the basis of her claims.  T-
     Mobile Mem. at 8:4-1 and 9:4-10.  But on the other hand, T-Mobile acknowledges that Ms. Laster
28   did not see those particular ads, and then argues that because of that, Ms. Laster has no standing to
     pursue her claims.  *Id.* at 14-15.

Next, T-Mobile points to an un-signed, single-page sales receipt.  T-Mobile Mem. at 10:12-15 (citing "Ex. L5").  That document does not have an itemization for any "tax," but rather, a nebulous charge described as "SAN DIEGO, CA, SAN DIEGO."  Tomasevic Decl., Ex. C.

While the sales receipt mentions that "some states" "may" impose a tax based on the retail price of a product and "therefore" the sales tax on the handset "may" be higher than expected; it is not specific to California, let alone this particular transaction.  It says that taxes "may" be assessed and not that they will, and it does not necessarily conflict with the contrary advertisements that told Ms. Laster she would not have to pay anything, including any taxes.[5]  *Id.*; Laster Decl., ¶ 3; Laster Depo. at 34:1-8, 47:25-48:4, 82:21-83:1.  Ms. Laster thought that the $28.22 charge described was for the service and not the "free" phone.  Laster Depo. at 40:25-41:1, 41:11-19, 52:12-15 ("Q. And you knew you thought that was a good price for the phone and the service? A. For the service.  The phone was supposed to be free.").

Finally, T-Mobile points to a small credit card receipt.  T-Mobile Mem. at 10:16-17 (citing "Ex. L1").  That receipt, as T-Mobile admits, is an agreement between Ms. Laster and her credit card company, not with T-Mobile.  Laster Depo. at 51:3-16 ("Q. And you understood at that point that you were agreeing to pay that amount of money to your credit card company? A.  Yes.").  Moreover, the credit card receipt does not itemize any particular charge and does not even have the word "tax" in it.  Tomasevic Decl., Ex. B.  In short, none of the three documents that T-Mobile cites conclusively prove that a presumption of sales tax reimbursement attaches to this transaction.

Second, even if a presumption were to somehow attach, it is rebuttable.  Cal. Civ. Code § 1656.1 (d) ("the presumptions created by this section are rebuttable presumptions").  Ms. Laster has rebutted that presumption, for purposes of summary judgment, by expressly declaring she did not agree to pay tax and that she assumed she would pay $0 for her phone.  Laster Decl., ¶ 3;

---

[5]  Moreover, the reference to the tax laws of "some states" in "Ex. L5" is itself misleading and likely to deceive consumers because it suggests (by using the word "therefore") that T-Mobile is somehow *required* to charge its customers some amount of tax based on a full retail price of the phone.  This is not true.  While T-Mobile may be required to pay a certain tax over to the state, nothing obligates T-Mobile to charge its customers.  The obligation to pay taxes belongs to the retailer, not the consumer and is consideration "for the privilege of selling tangible personal property at retail."  Cal. Civ. Code § 1656.1 (Historical Note citing Stats. 1978, ch. 1211, § 19 at 3925-3926); *Hibernia Bank v. State Bd. of Equalization,* 166 Cal. App. 3d 393, 400 (1985).

Laster Depo. at 34:1-8, 47:25-48:4, 82:21-83:1.  As far as Ms. Laster was concerned, a phone actually costing $0 (net) was part of the agreement with the T-Mobile.  *Id.*; *see* Cal. Civ. Code § 1656.1(a) (whether a retailer may add sales tax to the price "depends solely upon the terms of the agreement of sale").  T-Mobile's own advertisements rebut the presumption because they state that phones will be "free" without any caveat.  Laster Decl., ¶¶ 3-5, 7; Laster Depo. at 34:1-8, 47:25-48:4, 82:21-83:1; *see* Tomasevic Decl., ¶¶ 6-9, Exs. D-G; Butler Decl., Ex. A.

Whether or not this Court may presume that Ms. Laster agreed to pay sales tax is a red herring because the case is *not* about sales tax reimbursement, but rather, a retailer advertising a free product, but charging the consumer money upon consummation of the transaction.  Even if statutes regarding sales tax reimbursement were relevant, T-Mobile has not conclusively shown that any of the requirements for attaching the presumption have been met.  Finally, even if T-Mobile has surmounted these first two hurdles, T-Mobile cannot show that, as a matter of law, Ms. Laster will not be able to ever rebut that presumption.  Therefore, statutes regarding sales tax reimbursement and presumptions do not support T-Mobile's motion for summary judgment.

## C.      Ms. Laster Has Standing to Pursue Her Claims

The thrust of T-Mobile's standing argument is shocking.  T-Mobile wants to legalize deception.  T-Mobile boldly claims that because Ms. Laster "willingly purchased the phone," and because she was "satisfied" with paying $28.22, *at the time and for what she thought was activation and service*; that she has no standing to sue.  T-Mobile Mem. at 15:5-7 and 16:26; *cf.* Laster Depo. at 41:11-19, 42:23-43:3, 52:12-15 (Ms. Laster thought the charges were for something *other than* the phone.).  According to T-Mobile's formulation of standing under Article III and California statutes, no person duped into handing money over under false pretenses could ever recover that money so long as they "willingly" handed it over.  T-Mobile fails to account for the success of their deception.  T-Mobile's claims that Ms. Laster lacks both Article III and statutory standing fail as a matter of law.

### 1.      Ms. Laster Has Standing Under Article III

In order to establish Article III standing, Ms. Laster need only show that (1) she "suffered an injury-in-fact"; (2) there is "a causal connection between the injury and the conduct complained

12

1   of"; and (3) "it must be likely as opposed to merely speculative that the injury will be redressed by

2   a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal

3   quotations and citations omitted).

4         With respect to the injury-in-fact requirement, T-Mobiles does not deny, and in fact

5   acknowledges, that Ms. Laster paid a fee on the "free" phone. An injury in fact is "an invasion of a

6   legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not

7   conjectural or hypothetical." *Lujan*, 504 U.S. at 561 (internal quotations and citations omitted).

8   The amount of Ms. Laster's injury is reflected on her receipts.  It is undisputed that she actually

9   paid the amount.  There is no question as to the "concrete" nature of the injury, or whether or not it

10  was "actual."  T-Mobile also does not challenge the redressability element of standing.

11        T-Mobile appears to focus on the requirement of a "causal connection."  *See* T-Mobile

12  Mem. at 14:17-18.  This is a relatively low threshold that is satisfied if the injury is "fairly . . .

13  trace[able] to the challenged action" and is not the result of the actions of some independent third-

14  party not before the court. *Lujan*, 504 U.S. at 560 (citations omitted).  "This threshold requirement

15  does not rise to the level of proving proximate cause." *Smith v. Block*, 784 F.2d 993, 995 (9th Cir.

16  1986).  For purposes of summary judgment, Ms. Laster's specific facts regarding standing are to

17  be taken as true. *Lujan*, 504 U.S. at 561.

18        Ms. Laster relied on a T-Mobile advertising campaign that promised her she would pay

19  nothing for her phone.  Laster Decl., ¶¶ 3-4; Laster Depo. at 34:1-8, 47:25-48:4, 82:21-83:1.  At no

20  point was Ms. Laster apprised of the fact that she would have to pay a purported "tax" on her phone,

21  let alone an inflated one based on something other than the advertised price.  *Id.*  T-Mobile actually

22  charged Ms. Laster $28.22 for her "free" phone; but, at the time, she thought the $28.22 was a fee

23  for something other than the phone.  Laster Depo. at 40:25-41:19, 42:23-43:3, 52:12-15, 83:11-18.

24  T-Mobile, therefore, deceived Ms. Laster.  Laster Depo. at 52:12-15.  In short, there is more than a

25  mere "traceable" connection between the money Ms. Laster paid for her purportedly "free" phone,

26  and T-Mobile's advertising that the phone was in fact "free." *See also* Laster Decl., ¶¶ 4, 6.

27           **2.**   <u>**Ms. Laster Has Standing Under the UCL and FAL**</u>

28        Next, T-Mobile argues that Ms. Laster fails to meet the standing requirements under the

13

1   UCL, as modified by Proposition 64.  T-Mobile again misses the mark.  As a threshold matter, T-

2   Mobile erroneously, and without citation, suggests that standing requirements under the UCL are

3   somehow different than under Article III.  *See* T-Mobile Mem. at 12:6, *et seq*.  However, as the

4   California Supreme Court recently noted, Proposition 64 only sought "'to prohibit private

5   attorneys from filing lawsuits for unfair competition where they have no client who has been

6   injured in fact *under the standing requirements of the United States Constitution*.'"  *Tobacco II*, 46

7   Cal. 4th at 325, n.16 (citing Proposition 64 at § 1, subd. (e)) (emphasis added).  Furthermore, "if

8   the proponents of [Proposition 64] had intended some other standard of causation to apply, they

9   would have said so directly instead of using an elliptical reference to federal standing."  *Id.*  In

10  other words, because Ms. Laster has Article III standing as discussed above, Ms. Laster also has

11  standing under the UCL.

12      This is especially true because T-Mobile's acts may also be considered "unlawful" for

13  violating FTC regulations directly on point.  Stated differently, *Tobacco II*'s "actual reliance

14  requirement" only extends to those acts that are allegedly "fraudulent."  The Supreme Court

15  explains as follows:

16      We emphasize that our discussion of causation in this case is limited to such cases
        where, as here, a UCL action is based on a fraud theory involving false advertising
17      and misrepresentations to consumers.  The UCL defines "unfair competition" as
        "includ[ing] any unlawful, unfair or fraudulent business act or practice . . . ."
18      There are doubtless many types of unfair business practices in which the concept
        of reliance, as discussed here, has no application.
19

20  *Tobacco II*, 46 Cal. 4th at 326, n.17.

21      Ms. Laster has standing to pursue her claims under the UCL because she suffered injury

22  (the loss of at least $28.22) "as a result" of the defendants' improper conduct.  Cal. Bus. & Prof.

23  Code § 17204 (UCL actions may be brought by "a person who has suffered injury in fact and has

24  lost money or property 'as a result of the unfair competition.'"); *Tobacco II*, 46 Cal. 4th at 325.

25      The California Supreme Court, in *Tobacco II*, recently resolved the considerable debate

26  over what the "as a result of" language of section 17204 means.  In that case, plaintiffs alleged that

27  the tobacco company defendants violated the UCL by conducting a lengthy campaign of deceptive

28  advertising and misleading statements about the harms of tobacco.  *Tobacco II*, 46 Cal. 4th at 306.

14

1  Prior to the passage of Proposition 64, the superior court certified a class defined as: "'All people

2  who at the time they were residents of California, smoked in California one or more cigarettes

3  between June 10, 1993 to April 23, 2001, and who were exposed to Defendants' marketing and

4  advertising activities in California.'"  *Id.*  After the voters approved Proposition 64, however, the

5  defendants successfully moved for decertification of the class.  *Id.*  The defendants argued that

6  individual questions predominated over common questions of fact since Proposition 64 now

7  required each class member to show an injury in fact, consisting of lost money or property, as a

8  result of the alleged unfair competition.  *Id.*  The Superior Court agreed and the California Court

9  of Appeal affirmed.  *Id.*

10  The Supreme Court in *Tobacco II* reversed.  *Id.*  The California high court made two major

11  findings.  First, the post-Proposition 64 standing requirements apply only to the class representative

12  and not all absent class members.[6]  *Id.*  Second, a class representative proceeding on a fraud theory

13  involving misrepresentations as the basis for the UCL action must demonstrate actual reliance on the

14  allegedly deceptive or misleading statements.  *Id.*  However, the class representative need not "plead

15  or prove an unrealistic degree of specificity that the plaintiff relied on particular advertisements or

16  statements when the unfair practice is a fraudulent advertising campaign."  *Id.*  A plaintiff need not

17  "demonstrate   individualized   reliance   on   specific   misrepresentations   to   satisfy   the   reliance

18  requirement."  *Id.* at 327 (citing *Boeken v. Philip Morris, Inc.*, 127 Cal. App. 4th 1640 (2005)).

19  Finally, "an allegation of reliance is not defeated merely because there was alternative information

20  available to the consumer-plaintiff . . . ."  *Tobacco II*, 46 Cal. 4th at 328.

21  In finding an actual reliance requirement under the UCL fraud prong, the *Tobacco II* court

22  noted that this conclusion "is the beginning, not the end, of the analysis."  *Id.* at 326.  The court

23  then stated that:

24  _____

25  [6]  With this first holding, the California Supreme Court adopted the rule of many federal courts applying standing principals under Federal Rule 23.  Namely, whether describing Article III standing or some other "statutory" standing, those requirements only apply to the class

26  representative. *Tobacco II*, 46 Cal. 4th at 318-19; *Kohen v. Pacific Inv. Mgmt. Co. LLC*, 571 F.3d 672, 2009 WL 1919013 (7th Cir. 2009); *In re GMC Dex-Cool Prods. Liab. Litig.*, 241 F.R.D. 305,

27  310 (S.D. Ill. 2007).  T-Mobile, as it must, admits this.  T-Mobile Mem. at 12:3-5 ("The standing requirement focuses on the circumstances and alleged injury of the named plaintiff; the claims and

28  circumstances of the absent class members are irrelevant.").

> While a plaintiff must show that the misrepresentation was an immediate cause of the injury-producing conduct, the plaintiff need not demonstrate it was the only cause. It is not . . . necessary that [the plaintiff's] reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct. . . . *It is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing his decision.*

*Id.* (emphasis added, internal quotations and citations omitted). In further defining the reliance requirement, the *Tobacco II* court also adopted a presumption of reliance. *Id.* at 327. Specifically:

> a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material. A misrepresentation is judged to be material if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question, and as such materiality is generally a question of fact unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it.

*Id.* at 327 (citations and internal quotations omitted).[7]

The California Supreme Court's recent holdings in *Tobacco II* defeat T-Mobile's standing arguments.[8] Like in *Tobacco II*, T-Mobile promoted their "free" phones through a long-time, and pervasive marketing campaign that existed prior to February of 2005. Laster Decl., ¶¶ 3-5; Laster Depo. at 47:25-48:14 (T-Mobile's advertisements were "everywhere."). The "free" phone campaign continues to this day. *See* Tomasevic Decl., ¶¶ 6-9, Exs. D-G. These web offers were not only "likely to deceive" Ms. Laster, they actually *did* deceive her. Laster Decl., ¶¶ 3-4, 5 (Ms. Laster believed that she would pay "nothing" for her phone); Laster Depo. at 34:1-8, 47:25-48:4, 82:21-83:1.

Moreover, T-Mobile's "free" ad campaign was a "substantial factor" in Ms. Laster's decision to purchase, thereby satisfying *Tobacco II*'s "actual reliance" requirement. Laster Decl., ¶ 4; Laster Depo. at 47:25-48:4, 82:21-83:1 (an "important factor" for Ms. Laster was "to pay as little as possible for the phone itself"). And like in *Tobacco II*, it makes no difference that

---

[7] It makes no difference that *Tobacco II* discussed class certification proceedings and the sufficiency of pleadings because *Tobacco II* discussed not only what it takes to plead a proper UCL cause of action, but also, what it takes to prove one. *Tobacco II,* 46 Cal. 4th at 306, 326, 328.

[8] Notably and remarkably, T-Mobile's motion pays only lip service to the landmark *Tobacco II* decision – the California Supreme Court's most recent, and most influential decision on the topic of UCL standing – citing it only three times in its brief.

1   Ms. Laster might not be able to pinpoint a particular advertisement from many years ago that was

2   the proverbial "one" to lure her into the store.  *Tobacco II*, 46 Cal. 4th at 327.  In other words, it is

3   sufficient that the "free phone" campaign, in general, was the "substantial factor."[9]

4   Finally, Ms. Laster and her fellow class members are entitled to a "presumption" of reliance

5   here because the representations, regarding price, were "material."  *Id.*; *see also Donovan v. RRL*

6   *Corp.*, 26 Cal. 4th 261, 282 (2001) (a price term constitutes "a basic assumption upon which the

7   contract is made").[10]  Not even T-Mobile disputes that price terms were material to this transaction.

8   *See* T-Mobile Statement of Undisputed Facts, *compare* Laster Decl., ¶ 4; Laster Depo. at 47:25-48:4,

9   82:21-83:1 (price was an "important factor").  Because T-Mobile's representations regarding "free"

10  phones were a "substantial factor" in Ms. Laster's decision to purchase; and because the materiality

11  of the T-Mobile's representations about price create a presumption of reliance; Ms. Laster meets the

12  "actual reliance" requirement of the "fraudulent" UCL prong.[11]  This alone is sufficient to defeat T-

13  Mobile's standing arguments.  *Tobacco II*, 46 Cal. 4th at 326, n.17.

14  T-Mobile's reliance on a District of Massachusetts case, *Brown v. Board of America*, is

15  misplaced.  *See* T-Mobile Mem. at 17:5-14.  That case was about ATM fees and Bank of

16  America's alleged failure to disclose them to ATM users.  *Brown v. Bank of Am., N.A.*, 457

17  F. Supp. 2d 82, 84-85 (D. Mass. 2006).  That court granted summary judgment in favor of Bank of

18  America because the bank established that its ATMs all require that a customer consent to the

19  _____

20  [9]  In fact, Ms. Laster has made a *greater* showing of standing than many of the proposed plaintiffs
    in *Tobacco II*.  In *Tobacco II*, the plaintiffs complained about "decades" of marketing and
21  advertisements.  *Tobacco II*, 46 Cal. 4th at 306.  The class, though, included anyone smoking one
    or more cigarettes as late as April 23, 2001.  *Id.*  That, and the fact that, legally, consumers can
22  smoke at 18 years of age, and often times start younger, means that many members of the
    proposed class were *not even born* when some of the offending advertisements were disseminated
23  – let alone could show that they actually saw, read, or relied on them.  *See In re Tobacco II Cases*,
    142 Cal. App. 4th 891, 900-01 (2006) (the Court of Appeal Opinion that was reversed by
24  *Tobacco II*).

    [10]  The rule that reliance across the class could be presumed or inferred so long as the
25  representations were similar and/or material was merely reinforced in California by the *Tobacco II*
    decision.  *See, e.g., Vazquez v. Superior Court*, 4 Cal. 3d 800, 808 (1971); *Mass. Mut. Life Ins. Co.*
26  *v. Superior Court*, 97 Cal. App. 4th 1282 (2002); *Negrete v. Allianz Life Ins. Co.,* 238 F.R.D. 482,
    492 (C.D. Cal. 2006) (deceptive advertising case noting that "similar misrepresentations," a
27  "common scheme," or an "alleged overarching fraudulent scheme" satisfied both the commonality
    and the predominance requirement of Rule 23).

28  [11]  Again, T-Mobile's "unlawful" and "unfair" acts also confer standing on Ms. Laster.

17

1   assessment of a specifically-described fee before the Bank will levy a charge. *Id.* at 89. Each

2   ATM was equipped with a "click-through" screen that notified the user that he or she would be

3   charged a fee and required that the user consent before the transaction could proceed. This screen

4   ensured that every class member knew about the specific fee before it was assessed and guaranteed

5   that every class member assented to the transaction. *Id.* Even before ATM users encountered the

6   "click-through" screens, they were notified via printed placards on the front of the ATM itself that

7   described the fee with particularity. *Id.*

8       T-Mobile points to no such similar warning system. Not only did their receipts fail to

9   adequately disclose the charge, but there was no disclosure *prior* to Ms. Laster's decision to

10  purchase and her subsequent payment of the fee (other than the purported web disclaimer that

11  Ms. Laster never saw). Moreover, *Bank of America* did *not* involve an affirmative and contrary

12  misrepresentation that the product or service at issue would be "free."

13      **D.    T-Mobile's Motion Must Be Denied or Continued Under Federal Rule of
              Civil Procedure 56(f) Because Ms. Laster Was Precluded from Taking
14            Discovery on the Merits of Her Case**

15      The reasons stated above warrant denial of T-Mobile's motion. However, the fact that

16  Ms. Laster was precluded from taking any merits discovery in this matter provides separate and

17  additional grounds for denying T-Mobile's motion. Summary judgment is proper only after

18  adequate opportunity for discovery, so that no serious claim can be made that the losing party was

19  "railroaded" by a premature motion for summary judgment. *Celotex Corp. v. Catrett*, 477 U.S.

20  317, 326 (1986) (premature motions to be dealt with under Rule 56(f) Federal Rules of Civil

21  Procedure). Rule 56(f) provides that if a party opposing a motion for summary judgment shows

22  by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the

23  court may:  (1) deny the motion; (2) order a continuance to enable affidavits to be obtained,

24  depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order.

25  Moreover, where essential facts are in the moving party's possession, a Rule 56(f) continuance

26  "'should be granted almost as a matter of course.'" *International Raw Materials, Ltd. v. Stauffer*

27  *Chem. Co.*, 898 F.2d 946, 949 (3d Cir. 1990) (citation omitted); *see also Bliss v. Franco*, 446 F.3d

28  1036, 1042 (10th Cir. 2006).

18

Before T-Mobile filed its motion, it argued strenuously to limit discovery to only class certification issues. Docket No. 207 (Joint Report of Federal Rule 26(f) Conference where defendants requested that discovery "be limited initially to class certification issues, with merits discovery to be deferred unless and until certification is granted."). On March 4, 2009, Magistrate Judge Battaglia granted the Defendants' request and deferred merits discovery. Docket No. 214 at 1:24-26. Ms. Laster now must oppose T-Mobile's motion without any discovery related to the merits of this case. Tomasevic Decl., ¶¶ 10-15.

Discovery could impact the issues in this summary judgment motion. T-Mobile claims that the only offer Ms. Laster could have seen and relied on was the one web offer that contained the purported tax disclaimers. T-Mobile Mem. at 7-9. In truth, Ms. Laster never saw (and hence could not rely on) the infamous web offer. Further discovery – for example, document requests and a deposition of T-Mobile's most knowledgeable person regarding their advertisements running in or before February of 2005 – could determine whether or not *other* similar offers (whether by internet, newspaper, etc.) were published to California consumers and, if so, what those offers said. At no point does T-Mobile present irrefutable evidence that the one web offer with the disclaimers was the only one ever describing a "free" phone with the purchase of T-Mobile service and, hence, the only one that Ms. Laster could have ever been exposed to.

Stated differently, it is possible that if T-Mobile were to produce copies of "free" ads running during a specific time period, Ms. Laster may be able to then pick out the ones that she saw at the time and which affected her decision to purchase T-Mobile service and a phone. However, as the California Supreme Court recently stated, it is not necessary for Ms. Laster to point to any specific ad (presumably one of many) published years ago. *Tobacco II*, 46 Cal. 4th at 327 (when an ad campaign is at issue, a plaintiff need not pick out one specific ad). The point, though, is that T-Mobile likely possesses numerous ads that it published in or before February of 2005. It cannot claim that one, and only one, web ad is at issue here and that the one ad is not false while at the same time withholding other ads pursuant to an order limiting the scope of discovery.

T-Mobile also argues that there is no way Ms. Laster could have relied on any web offer[12] for the phone she ultimately purchased because that offer was allegedly only available on the web. T-Mobile Mem. at 7:19-21.  The facts, of course, belie this assertion because Ms. Laster *did* get the "offer" in the store – albeit with an improper surcharge deceptively tacked on.  T-Mobile Mem. at 3:20-4:4.  Even accepting T-Mobile's version of the facts as true, the T-Mobile store manager offered or allowed the consummation of the "web only" transaction in the store.  Document requests, interrogatories, and perhaps a deposition of that manager (Rhiannon Green) could determine what led to this alleged concession.  Furthermore, discovery could reveal whether or not T-Mobile typically allowed web offers to be consummated in stores and whether or not this was T-Mobile's regular practice – thereby undercutting T-Mobile's assertion that the web offer for Ms. Laster's phone was truly a "web-only" offer or if it was otherwise likely to deceive consumers.

Finally, even *if* this Court were to accept T-Mobile's version of the facts regarding the web offer, T-Mobile has not presented evidence that the offer itself actually complies with the UCL, FAL, or relevant FTC regulations.  For example, federal law requires that *all* the terms, conditions and obligations upon which receipt and retention of the "Free" item are contingent "*be set forth clearly and conspicuously at the outset of the offer so as to leave no reasonable probability that the terms of the offer might be misunderstood*."  16 C.F.R. § 251.1(c) (emphasis added).  All of the terms, conditions and obligations should appear "*in close conjunction with the offer of "Free" merchandise or service*."  *Id.*  Footnotes or asterisks may not be used because they fail to set out the terms and conditions "at the outset."  *Id.*

Here, the web offer is merely a printout of a web page from a store employee and not some printed ad that Ms. Laster brought in herself.  There is no declaration from any, for example, information technology officer at T-Mobile that would tend to show whether this page comes at "the outset" of the actual offer or if this page is encountered, again for example, long after the internet purchaser has already provided credit card information.

---

[12]  Again, Ms. Laster's version of the facts (that she never saw nor considered the web offer with the disclaimers) must be accepted over T-Mobile's.  *Eastman Kodak Co.*, 504 U.S. at 456 (non-movant's version of any disputed issue of fact is presumed correct).

1    There is no evidence whatsoever of how a consumer like Ms. Laster might happen across

2    this web page and what other representations are given prior to or in conjunction with the offer.

3    There is no showing that the disclaimer page is given "in close conjunction" with the offer of

4    "Free." Even today, to get to similar disclaimers regarding taxes and shipping charges, consumers

5    must click through multiple web pages that are not clearly marked. Tomasevic Decl., ¶ 9, Ex. G.

6    Even as a threshold matter, Ms. Laster never had the chance to discover what T-Mobile considers

7    to actually *be* "the offer." In short, if Ms. Laster had the chance to serve discovery on the merits,

8    she would have asked about T-Mobile's website design and usage of the word "free" on that

9    website. She would have asked what, exactly, does T-Mobile consider to be an "offer" of "free

10   phones." And she would have attempted to determine whether or not the terms and conditions that

11   T-Mobile relies upon so heavily were available "at the outset" and in "close conjunction" with the

12   initial offer of "free" as required by federal law. *See* 16 C.F.R. § 251.1(c). Tomasevic Decl.,

13   ¶¶ 10-15.

14   This information is exclusively within T-Mobile's possession. *See International Raw*

15   *Materials, Ltd*, 898 F.2d at 949 (when essential facts are in the moving party's possession, Rule

16   56(f) relief "'should be granted almost as a matter of course'"). And because Ms. Laster was

17   precluded from attempting to get that information, good cause exists for denying T-Mobile's

18   motion under Rule 56(f).

19   **VI.    CONCLUSION**

20   Based upon the foregoing, Ms. Laster respectfully requests that this court deny T-Mobile's

21   motion for summary judgment in its entirety. In the alternative, Ms. Laster requests that this court

22   continue this hearing in accordance with Federal Rule of Civil Procedure 56(f) because Ms. Laster

23   was precluded from conducting merits-based discovery.

24   DATED: August 14, 2009                    HULETT HARPER STEWART LLP
                                                KIRK B. HULETT
25                                              DENNIS STEWART
                                                SARAH P. WEBER
26

27
                                                  */s/ Sarah P. Weber*
28                                              SARAH P. WEBER

                                                21

525 B Street, Suite 760
San Diego, CA  92101
Telephone:      (619) 338-1133
Facsimile:       (619) 338-1139

NICHOLAS & BUTLER, LLP
CRAIG M. NICHOLAS
MATTHEW B. BUTLER
ALEX M. TOMASEVIC
225 Broadway, 19th Floor
San Diego, CA  92101
Telephone:      (619) 325-0492
Facsimile:       (619) 325-0496

Attorneys for Plaintiffs

05CV1167DMS (AJB)